**STATE of Minnesota, Appellant,**

v.

**Willard John BRAZIL, Respondent.**

No. 48305.

Supreme Court of Minnesota.

June 2, 1978.

Warren Spannaus, Atty. Gen., St. Paul, Dennis P. Moriarty, County Atty., Shakopee, for appellant.

Richard D. Genty, First Dist. Public Defender, Winsted, for respondent.

Heard before ROGOSHESKE, PETERSON, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal by the State of Minnesota from a pretrial order of the district court suppressing certain evidence sought to be used against defendant, Willard John Brazil, in a prosecution for the alleged violation of several statutes regulating controlled substances. We affirm.

On October 6, 1977, at 10:30 a. m., Barry Brandt, a police officer for the city of Savage, Minnesota, received a phone call from Lynn Broberg, an employee of the Spur Cafe in Savage. Broberg told Officer Brandt that Renee Kempson would attempt to sell heroin to Broberg at the cafe between 12 and 12:30 p. m. that same day. Broberg, who had never previously been a police informant, also said that Kempson would be driving a yellow Trans Am automobile, had blonde hair, and would sell two "fifty-cent" bags of heroin to Broberg for $100. No comment was made regarding whether Kempson would be alone or accompanied at the sale. In addition, Broberg said that Kempson was a friend of hers and that she was making this call because she wanted Kempson to receive medical treatment for heroin addiction.

Between the time of the telephone call and noon, the Savage police gave Broberg $100 in marked $20 bills and established a signal by which Broberg would indicate that the sale of heroin was completed; after the sale had been completed, Broberg would run both of her hands through her hair from her forehead to the back of her head.

Prior to Kempson's arrival at the cafe, Gerald M. Poole, a city of Shakopee police officer, and Alan McCall, a city of Savage police officer, went to the restaurant dressed in plain clothes. Poole and McCall stationed themselves inside the restaurant while Chief of Police Richard O'Keefe, Officer Brandt, and Officer Gary J. Bombeck,

another city of Savage police officer, remained outside.

At approximately 12:20 p. m., a yellow Trans Am automobile drove into the parking lot of the cafe. A female, who matched the description of Kempson and was later identified as Kempson, exited from the driver's side of the Trans Am. This was the first time the police officers observed a passenger in the Trans Am. The passenger was later identified as Brazil.

Kempson came into the cafe and attempted to contact Broberg. After a 5-minute wait, Broberg and Kempson met and exchanged a few words. Broberg then purchased two packets of heroin from Kempson for $100 and ran her fingers through her hair to indicate that the exchange had taken place. Officers Poole and McCall then arrested Kempson inside the restaurant.

Having seen Brazil in the automobile, Officer Poole left Kempson with McCall, went outside, and headed directly for the Trans Am. When Poole was within 10 to 15 feet of the Trans Am, he drew his gun and ordered Brazil out of the vehicle after seeing Brazil make what the state characterizes as a "furtive" movement. Officer Bombeck also drew his weapon and assisted in the arrest of Brazil. Poole and Bombeck were then joined by Officer McCall.

Poole frisked Brazil for weapons and handcuffed him. No weapons were found on Brazil or in the car after an inventory search. Both Kempson and Brazil were taken to the city's public safety building.

Brazil and Kempson were then given Miranda warnings and both said they understood their rights. Brazil was searched more thoroughly and Officer Poole found three tinfoil packets containing a brown substance, later identified as heroin, in a zippered compartment underneath the lapel of a leather jacket Brazil was wearing.

About 40 minutes after the Miranda warnings were given, Officer Brandt heard Kempson say to Brazil: "I'm sorry that you got busted; we should never have had the stuff in your collar." According to Brandt,

Brazil said nothing but made a gesture—"a shrugging of the shoulders and the shaking of his head."

Brazil was charged with selling a controlled substance (heroin), possession of a controlled substance, and possession of a controlled substance with intent to sell in violation of Minn.St. 152.09, subd. 1(1, 2); 152.15, subds. 1 and 2(1); and 609.05.

At an omnibus hearing conducted on October 20 and 25, 1977, the primary issue was whether the police authorities had probable cause to arrest Brazil for violations of the controlled substances statutes. Officer Brandt testified that the police had no idea how many people would accompany Kempson and that his first observation of Brazil was at the Spur Cafe parking lot. At the time Brandt saw the passenger in Kempson's car, Brandt had no idea who the passenger was, how long he had been in the car, or where he had come from. Brandt also testified that none of the officers had any information as to Brazil at the time they took him into custody and that none of the officers had observed Brazil commit any public offenses.

Officer Poole gave the following account of his actions and observations upon spotting Brazil in the Trans Am:

"Q	What did you observe?
"A	I observed the defendant then look away and in a manner, was going over like this, in the car towards the driver's side. At this time I pulled my revolver.

\*	\*	\*	\*	\*	\*

"Q	At the time, Officer, that you moved from the Spur Cafe to the direction of the yellow Trans Am and drew your revolver, what was your intention?
"A	What was my intention?
"Q	Right.
"A	In the drawing of the revolver or moving towards the Trans Am?
"Q	Both of those.
"A	The drawing of the revolver to protect myself, as I had no knowledge whether the defendant was armed

or unarmed, and the second—and the motion that he made toward the driver's side, I didn't know if he was going to go over the middle part of the car and get into the driver's seat and leave or if he was reaching under the seat to grab a weapon or what. My intention was to secure the defendant.

"Q Was your purpose to arrest the defendant, the defendant Brazil?

"A Yes, sir.

"Q All right. For what purpose?

"A Because I felt that he had—that he conspired or got together with Miss Kempson to procure the heroin for Miss Broberg.

* * * * * *

"Q You don't know what this person was doing other than he made a movement about the time that you were coming out and coming up to the car, right?

"A That's correct, sir.

"Q You don't say it was any criminal movement, but under the circumstances you felt that it might require some action on your part and to be safe you took some action, pulled your gun and made your warning, right?

"A I guess you could say that, yes, sir.

"Q He didn't jump from one seat over to the next one, he simply reached across and may well have been changing the station on the radio, right?

* * * * * *

"A I don't know what the individual was doing, sir.

"Q Okay. But of all the things he might have been doing, that is one of them?

"A That is a possibility, yes, sir.

* * * * * *

"Q The reason for arresting defendant Brazil was because it occurred to you that perhaps he had somehow conspired with Kempson in regard to this incident?

"A I would say that would be one of the reasons, yes, sir.

"Q What were the others, if any?

"A Protection of myself was the main reason.

"Q All right. But he was frisked and he wasn't armed, so we come right back to your hunch that there was a possibility that he might have been somehow involved?

* * * * * *

"THE WITNESS: I don't believe 'hunch' is a proper word, but, yes, sir.

* * * * * *

"Q Well, you didn't know, you had no advance information regarding that?

"A No, sir.

"Q You simply thought that there he was, he had come in this car and he might possibly be involved, period, that's all you knew, right?

"A Sure."

Officer Poole also testified that Kempson was the only person the police were looking for and that the only person the police had advance knowledge about was Kempson. Officer McCall's testimony was similar regarding the lack of prior information about Brazil.

Finally, Officer Bombeck testified as follows:

"Q Did you observe anything in relation to the movements if any of the passenger in the Trans Am?

"A The passenger appeared to take a slight turn to his left with his arm possibly—it was just a movement, I guess, to the left.

* * * * * *

"Q The movement that you observed defendant Brazil make was a move that would have been consistent with a right-front seat passenger moving to change the station on the radio?

"A No. As I recall, it actually looked like his hand was going down a little below the front seat, even possibly

to the console. In the direction of the radio, yes.

"Q But in the direction of the radio?

"A Yes.

"Q Did you observe whether he was smoking anything as you approached the car?

"A I don't recall anything.

"Q And the type of movement might have been consistent with putting something into an ashtray, would it not?

"A Might have been.

　　*　　*　　*　　*　　*　　*

"Q * * * [W]hy did you arrest Mr. Brazil in the parking lot of the Spur Cafe?

"A At that time I believed that Mr. Brazil possibly had been a co-conspirator in the sale of the drugs."

On the basis of this testimony, the trial court held that "the Savage Police lacked probable cause to arrest the defendant under the circumstances of this case" and ordered all evidence obtained as a result of the searches and seizures or as a result of Brazil's statements "in the nature of confessions" to be suppressed.

　The crux of this matter on appeal reduces itself to whether the trial court was correct in finding that the police had no probable cause to arrest the defendant and deciding therefore that all evidence flowing from the illegal arrest was the fruit of that poisonous tree and subject to suppression as against this defendant.

The trial court in a memo filed with its findings and conclusions and omnibus order stated:

"Probable cause is a reasonable grounds of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. (*State v. Sipera*, [*Sipera v. State*], 286 M[inn.] 536 [175 N.W.2d 510]). Putting it another way, the test is whether the facts available to the arresting officer at the moment of the arrest would warrant a man of reasonable caution in the belief that an offense has been committed. (*Beck v. Ohio*, 379 U.S. 89 [85 S.Ct. 223, 13 L.Ed.2d 142]).

"Here, the only thing connecting the defendant to the drug sale by Kempson was his presence in Kempson's car. No one had been informed Kempson was bringing someone with her, so defendant's presence was a surprise. The car belonged to Kempson and defendant was merely a passenger. All of the criminal action took place inside the Cafe and the defendant never left the Trans Am so in no way could he be directly connected with the sale. Thus, as in *State v. Clark*, (250 N.W.2d [199] 202) at the time of the defendant's arrest, the police had no information concerning him or his activities. They must have concluded (and rightly so considering the fruits of their search of his jacket) that since he was with a drug peddler, he must be one himself, but mere suspicion doesn't satisfy the requirements of probable cause, (*State v. Fish*, 280 M[inn.] 163 [159 N.W.2d 786]), and a person cannot be arrested and searched merely because he is found in suspicious circumstances. (*State v. Clark, Supra*, and *State v. Slifka*, 256 N.W.2d 90). As stated in Sipera (*Supra*), suspicion must be supported by strong circumstances pointing toward the defendant's guilt, and here there just aren't any at all, let alone strong ones. The evidence was illegally obtained and must be suppressed.

"[/s/ John M. Fitzgerald
JOHN M. FITZGERALD
Judge of District Court]"

We affirm on the same basis that this thorough and concise analysis by the trial court indicates, with the understanding that the result of the application of the constitutional concept enunciated applies to defendant and does not apply to Kempson.

The only further matter that need be mentioned is the state's concern that under such a holding officers would be forced to ignore the presence of a person found in similar suspicious circumstances. This ignores *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct.

1868, 20 L.Ed.2d 889 (1968). Under Terry, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officers * * *," the officer may "stop and frisk" the suspect for weapons. 392 U.S. 24, 88 S.Ct. 1881, 20 L.Ed.2d 908. Terry would apply to this factual setting, but once the defendant is frisked and nothing further is found, the application of Terry ceases.

Affirmed.