459 A.2d 379

**COMMONWEALTH of Pennsylvania**

v.

**Donald E. HOOK, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 8, 1982.
Filed April 15, 1983.

1

John Francis Hooper, Pittsburgh, for appellant.

Dara A. DeCourcy, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before BROSKY, CIRILLO and POPOVICH, JJ.

BROSKY, Judge:

Appellant was convicted, without a jury, of one count of possession of a controlled substance with intent to deliver.[1] He argues that his conviction should be reversed because the cocaine taken from him was the fruit of an illegal arrest and should therefore have been suppressed. In the alternative, he contends that if we find that the cocaine was seized not pursuant to arrest, but rather during a "stop" we ought then to conclude that it was taken during a search that exceeded the permissible limits of such searches. He also challenges the sufficiency of the evidence. Because we find that cocaine was seized from appellant pursuant to an illegal arrest, we reverse.

The factual circumstances relevant to this appeal are as follows.

At six a.m. on April 7, 1980, two Allegheny County policemen responded to a radioed message that two men, one of whom had a gun, were in a nearby 7-Eleven Store. Within a few minutes, the officers entered the store where they encountered appellant standing near the door. Appellant told the officers that he was "waiting for [his] buddy, who was buying munchies." A store clerk told one of the officers that the other non-employee, "the shorter man with the sweater," had the gun. The officer noticed a lump

1. Act of 35 P.S. § 780–113(a)(30).

4

protruding from the man's sweater and removed a gun. Both appellant and the man with the gun were taken outside. During a pat-down search outside the store, a sock containing cocaine was seized from appellant.

Mr. Hook contends that he was under arrest when he was led out of the store. The Commonwealth, on the other hand, contends that he was not arrested until the cocaine was found. It is the Commonwealth's position that until that time, Mr. Hook was detained during an investigatory "stop."

■ It is clear that police may detain a person briefly without having probable cause to arrest him. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a police officer could constitutionally stop a pedestrian for investigatory purposes and conduct a reasonable search for weapons for the protection of the police officer where he has reason to believe that he is dealing with an armed and dangerous individual. Such a stop may be made regardless of whether the officer has probable cause to arrest the individual for a crime. The court said, "the officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27, 88 S.Ct. at 1883. See also *Commonwealth v. King*, 247 Pa.Super. 443, 372 A.2d 908 (1977).

Our review of the arresting officers' testimony at the suppression hearing leads us to conclude that prior to the seizure of the cocaine, appellant had been arrested and not merely stopped.

Officer Stiger, the senior officer, did testify that when Mr. Hook was led out of the store he was not free to leave.

■ Although the limitation of one's freedom can certainly be an indication that a person has been arrested (see e.g. *Commonwealth v. Richards*, 458 Pa. 455, 327 A.2d 63 (1974), the officer's subjective view that appellant was not free to leave is of no moment *absent an act indicating an*

*intention to take appellant into custody.* See *Commonwealth v. Holmes,* 482 Pa. 97, 393 A.2d 397 (1978) (emphasis added).

Arrest has been defined as any act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest. *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963).

The testimony of Officer Casey indicates that the officers did intend to take Mr. Hook into custody prior to the discovery of the cocaine. At the suppression hearing, the officer described what occurred outside of the store when McCandless Township Police arrived. Mr. Hook had not yet been frisked and a McCandless Officer approached Officer Casey who testified as follows.

I was still on face with him. I had him right in front of me, and Lieutenant VanLeer came out with it. He said was this guy under arrest; is he being held? I says, "Yes, he's being detained, also." He said, "Has anybody patted him down," and I said, "Yes, we are taking him, and he has to be patted down." You don't put anybody in a police car that isn't patted down.

In a recent decision, our Supreme Court held that a person who is transported in a police car after a "pat-down" search albeit for investigatory purposes, has been arrested and not merely "stopped." In *Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982), the court rejected the Commonwealth's argument that the appellant's seizure without probable cause to arrest could be justified as an investigatory "stop." The court noted that the *Terry* principle is an exception to the general rule requiring probable cause to arrest. The court emphasized that the exception must not be extended in such a fashion as to swallow the rule (slip opinion at 10). Given the evidence that the officers intended to take Mr. Hook into custody prior to the cocaine discovery, we must find that he was under arrest prior to the frisk. This conclusion is especially called for in view of *Lovette,* supra.

6

Citing the U.S. Supreme Court decision in *Davis v. Mississippi*, 394 U.S. 721, 726–7, 89 S.Ct. 1394, 1397–1398, 22 L.Ed.2d 676 (1969), the *Lovette* opinion observed:

> [T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed "arrests" or "investigatory detentions."

498 Pa. 675, 450 A.2d at 980.

■ We reach this decision aware that it would have been permissible for the officers to detain Mr. Hook for an investigatory "stop." Mr. Hook and his companion were in a store at 6 a.m. when his companion was found to have a gun. The officers might have reasonably believed that criminal activity was afoot and proceeded to stop Mr. Hook to investigate. See *Terry*, supra; *Commonwealth v. Trenge*, 305 Pa.Super. 386, 451 A.2d 701 (1982). Under such circumstances, a limited search for weapons would have been permissible. See *Commonwealth v. King*, 247 Pa.Super. 443, 372 A.2d 908 (1977).

However, in the present case, the officers indicated their intention to take Mr. Hook into custody and subject him to their control before they had probable cause to arrest.

■ Prior to the search, the officers lacked probable cause to arrest Mr. Hook for any crime. His companion was arrested for illegal possession of a firearm. No robbery had been attempted, nor was there evidence that such a crime was planned. Mr. Hook's only involvement, prior to the cocaine discovery, was as the companion of a person who himself possessed a firearm. While he could reasonably be investigated, Mr. Hook could not be arrested simply for being in the company of the arrested man. Therefore,

we must conclude that Mr. Hook's arrest, made prior to the cocaine discovery, was without probable cause.

■ We are forced to conclude that the lower court erred in not suppressing the cocaine.

In *Commonwealth v. Blakey*, 282 Pa.Super. 591, 423 A.2d 402 (1980), we explained the test that is employed to determine whether evidence is the "fruit" of an illegal arrest. Citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), we said, the inquiry made is:

Whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Blakey* 282 Pa.Super. at 598, 423 A.2d at 406.

Whether the evidence has been purged is based on the totality of the circumstances. *Blakey*, supra.

■ Appellant was interrogated by county police because he had been arrested. The interrogating officer who testified at the suppression hearing was asked if he had occasion to interview appellant *as a result* of his arrest the previous day. He replied that he had.

In *Commonwealth v. Jackson*, 459 Pa. 669, 331 A.2d 189, 192 (1975), our Supreme Court noted:

There are two factors which seems to be of major significance in determining the relationship between an illegal arrest and, as here, the subsequent confession: (a) the proximity of an initial illegal custodial act to the procurement of the confession; and (b) the intervention of other circumstances subsequent to an illegal arrest *which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest.* (Emphasis added) (citations omitted)

The interrogation took place only one day after appellant's arrest. During that time period, he had been con-

fined to jail. We find no evidence of circumstances after appellant's arrest that caused his confession. Rather, it seems clear that it directly resulted from the arrest. See *Jackson,* supra, where similar facts netted the same result. See also *Commonwealth v. Whitaker,* 461 Pa. 407, 336 A.2d 603 (1975), where our Supreme Court held that the giving of the *Miranda* warning does not *per se* dissipate the illegality. Finally, we note our decision in *In the Interest of Stoutzenberger,* 235 Pa.Super. 500, 344 A.2d 668, 671 (1975), where we noted,

> Generally, unless new developments occur after an illegal arrest, such as the discovery of additional information linking the accused to the crime, any statements made by an accused as a natural consequence of being in custody due to an illegal arrest must be suppressed.

The statements should have been suppressed.

Given our disposition of those questions, we need not address the remaining issues raised by appellant.

Judgment of sentence reversed and case remanded for new trial.

POPOVICH, J., files dissenting opinion.

POPOVICH, Judge, dissenting:

I dissent from the reversal of appellant's conviction for possession of a controlled substance with intent to deliver (35 P.S. § 780–113(a)(30)). Contrary to the Majority, I find that the cocaine seized from appellant's person was done so pursuant to a "stop and frisk" and not as the by-product of an illegal arrest.

Considering the evidence of the Commonwealth's witnesses and so much of the evidence for the defense as remains uncontradicted, *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976), the events leading to Hook's arrest were as follows: At approximately 6:00 a.m. on April 7, 1980, Allegheny County Police Officers Stiger and Casey [1]

---

1. Officer Stiger had 15½ years experience with the police force, while Officer Casey had been on the force just over a year.

received a radio message that there were two men at the 7-Eleven near the North Park area of Pittsburgh; one was carrying a firearm. While en route to the store, which was only a matter of 2 to 3 minutes away, the officer called for a back-up unit. When the two officers arrived at the scene, they noticed two vehicles in the parking lot, one was a Chevrolet—this belonged to the cashier employed at 7-Eleven—and the other was a tan/brown colored van. No others were present.

As Officers Stiger and Casey entered the convenience store, they had "no idea what [they] were coming in against ...." (N.T. 29) The first thing the officers observed was a man standing to the right of the entrance way. Officer Stiger asked this person (appellant), "Could you hold it here for a minute, sir?" As Officer Stiger made his way to the center of the premises, the person responded, "I'm waiting for my buddy. He's getting munchies." (N.T. 11) Officer Casey had stationed himself near the entrance. At this point, after observing no other patrons in the establishment, Officer Stiger was told by the manager (Mr. Piwonski), who was stocking the shelves, that, "At the cash register the shorter man with the sweater has the gun." (N.T. 10) As Officer Stiger approached the man at the check-out counter, later identified as the co-defendant Viola, he noticed a lump protruding from the back of Viola's sweater. Officer Stiger tapped it and felt a hard object, which prompted the officer to immediately lift Viola's arms. With this, Officer Casey came over to the counter, lifted Viola's sweater and removed the firearm. Thereafter, Officer Stiger asked Viola if he had a permit for the weapon. Viola answered, "No." As a result thereof, Viola was told by Officer Stiger that he was under arrest. Since the police did not know whether Hook was armed, and since the cashier and manager were still on the premises, they decided not to remain in the store. Officer Stiger walked with Viola and Officer Casey to the exit and asked appellant, "Would you mind stepping outside." (N.T. 15) Once in the parking lot, Viola, in response to a question regarding where his vehicle was

located, stated that the van was his. Following this, the group made its way to the vehicle and Officer Stiger began reading the two their *Miranda* rights. While doing so, the officer noticed a bulge in the pocket of Hook's jacket. At this juncture, during the recital of rights, Officer Stiger started to pat-down Hook. Upon feeling a hard object in the jacket, the officer removed it and handed it to Officer Casey—by this time, the back-up unit had arrived from McCandless Township. When the object was examined, it was found to be a sock containing four plastic bags of white powder, which were later tested and determined to be cocaine.[2] At this point, Officer Casey placed appellant under arrest.

Thereafter, appellant and Viola were transported to police headquarters, questioned and later arraigned.

The Majority embraces appellant's argument that he was placed under arrest when he was led out of the store, rather than after the cocaine was seized from his person. Ergo, appellant continues, the absence of probable cause to believe that he had committed a crime in 7-Eleven rendered his arrest illegal and the evidence, secured as an incident thereto, tainted.

I note with interest that the Majority's conclusion that appellant was arrested in the store turns precariously upon a *single* statement made by Officer Casey, at the suppression hearing, as to *his intentions* regarding the appellant prior to the cocaine discovery. The testimony in question was given on direct examination in response to the query, "And at what point was Mr. Hook searched, if at any time?" Officer Casey responded:

"I was still on face with him. I had him right in front of me, and Lieutenant VanLeer [—one of the officers from McCandless Township serving as the back-up unit—]

**2.** Officer Casey testified that at first he thought the object, which was very common in the North Park area of Pittsburgh, was a "sap." That is, a sock filled with sand that when swung, according to the officer, was "almost a stone, and [if] you hit somebody in the side of the head or temple with it, you'll kill him. It's a very effective weapon." (N.T. 67)

came out with it [—*i.e.*, co-defendant Viola's expired firearm's license secured from the van]. He said was this guy under arrest; is he being held? I says, 'Yes, he's being detained, also.' He said, 'Has anybody patted him down,' and I said, 'Yes, we are taking him, and he has to be patted down.' You don't put anybody in a police car that isn't patted down." (N.T. 64)

Leaving for a moment the weight one may ascribe to the *subjective* views of an officer, this writer finds that the Majority attaches undue significance to the preceding excerpt, especially in light of the fact that later on in Officer Casey's testimony he clarifies the moment at which he placed appellant under arrest. To-wit, Officer Casey was recounting how once the substance was removed from the sock and Lieutenant Van Leer opined, "I think it's cocaine," "[t]hat was [the police's] first indication" that appellant was involved in the commission of a crime. Immediately after this statement, Officer Casey then testified, *"At that point, I put my hand on Mr. Hook's shoulder and told him he was under arrest."* (Emphasis added) (N.T. 68) Additionally, when Officer Casey was confronted on cross-examination with the question by appellant's counsel as to whether he had answered "Yes" when asked by McCandless Township Lieutenant Van Leer if appellant was under arrest, the officer's unequivocal reply was, "No." (N.T. 80) Further examination of the suppression hearing transcript reveals that Officer Stiger testified to the following on cross-examination:

"[Appellant's counsel]

Q. Now, you take both of them outside. You testified during your direct examination that at the point you searched Mr. Viola and you searched Mr. Hook, then you found the stocking, then you put them under arrest and read them their rights. Was that the sequence of events?

[Officer Stiger]

A. *Well, yes, Mr. Hook was placed under arrest outside.*

Q. When you walked outside the doors with Mr. Hook, you had not searched him at that point; is that correct?

A. Mr. Hook? No.

Q. You had not physically said to him, 'You are under arrest,' but *in your mind he was still being restrained;* is that correct?

A. Yes. Like I said, I wanted to get him outside of the store where there was [sic] other people, two other people inside the store.

\* \* \* \* \* \*

Q. When you got outside, did you read them the *Miranda* Warnings first or search first?

A. I started to read them the *Miranda* Rights first.

Q. Then you stopped?

A. Well, no, I didn't stop. I noticed the bulge in his pocket and I continued reading him his *Miranda* Rights, and that's when I removed the stocking.

Q. You had started reading the *Miranda* Rights prior to the time you had observed the stocking in his pocket?

A. When I started to pat him down, I started reading him the *Miranda* Rights out.

Q. *He was under arrest at that point, wasn't he?*

A. *No, he wasn't under arrest then. We didn't place him under arrest until —*

Q. You didn't physically tell him he was under arrest, but he couldn't leave, could he?

A. Well, no, he couldn't have left."

(Emphasis added) (N.T. 37–39)

In light of the preceding, the Majority's position that the *singular* statement of Officer Casey (reproduced *supra*) leads inexorably to the conclusion that the police *intended* to arrest Hook prior to the securement of the cocaine, rather than "restrain" his movement so that a "stop and frisk" consistent with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) could be effectuated, is untenable. As the Fifth Circuit Court of Appeals has noted, in a case similar to the one at bar, *"Terry cannot be read to*

*condemn a pat-down search because it was made by an inarticulate policeman whose inartful courtroom testimony* is embellished with assertions of bravado, so long as it is clear that he was aware of specific facts which would warrant a reasonable person to believe he was in danger." (Emphasis added) *United States v. Tharpe*, 536 F.2d 1098, 1101 (5th Cir.1976). Here, the record not only adequately reflects the police's apprehension for their safety, but it also indicates concern on the part of the police for the safety of the 7-Eleven employees, which, in fact, was the motivating factor for taking the appellant and Viola outside. *See* Model Code of Pre-Arraignment Procedure § 110.2(4) (Proposed Official Draft, 1975) (an officer who has stopped a person may pat-down for a weapon "if the officer reasonably believes that his safety or the safety of others then present so requires.").

I believe that the lower court did not err in its ruling that the police were justified in conducting a *Terry*-type "stop and frisk" of the appellant. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). In *Terry* the United States Supreme Court held that where a police officer lacks probable cause to arrest an individual who may be involved in the commission of a crime, he may stop such person for questioning. If there is also reason to believe that the individual stopped may be armed, the officer may conduct a limited pat-down search for weapons of the person's outer clothing.

The Court emphasized in *Terry* that the test to be used in determining whether a police officer's intrusion was justified is an *objective* one; *viz.:*

"... [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The

scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (Footnotes omitted) (Citations omitted) 392 U.S. at 21–22, 88 S.Ct. at 1880.

The Court then recognized that it is not always unreasonable to seize a person and subject him to a limited search for weapons where there is no probable cause for an arrest, stating:

"[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30, 88 S.Ct. at 1884–1885.

Thus, if the totality of circumstances affords an officer reasonable grounds to believe that criminal activity may be afoot, he may temporarily detain the suspect. If, after the detention, his personal observations confirm his apprehension that criminal activity may be afoot and indicate that the person may be armed, he may then frisk him as a

matter of self-protection. *Adams v. Williams, supra; Terry v. Ohio, supra.*

It does not matter that subjectively Officer Casey may have felt that appellant, at least at one point in the confrontation, was under arrest. " '[T]he scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer.' *United States v. Clark,* 559 F.2d 420 (5th Cir.1977), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977), *quoting United States v. Resnick,* 455 F.2d 1127 (5th Cir.1972). The officer's subjective opinion is not material. Nor are the courts bound by an officer's mistaken legal conclusion as to the existence or non-existence of probable cause or *reasonable* grounds for his actions." *State v. Peck,* 305 N.C. 734, 291 S.E.2d 637, 641 (N.C.Supr.Ct.1982). The seizure and search (known in street vernacular as "stop and frisk") is valid when the *objective* facts known to the officer meet the standard required. *Terry v. Ohio, supra; see also Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168, *reh'g denied,* 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150 (1978); *United States v. Tharpe, supra; United States v. Bugarin-Casas,* 484 F.2d 853 (9th Cir.1973), *cert. denied,* 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974); *Klinger v. United States,* 409 F.2d 299 (8th Cir.1969), *cert. denied,* 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); *Commonwealth v. Pinney,* 474 Pa. 210, 213, 378 A.2d 293, 295 (1977) ("it is this Court's duty to make an independent examination of probable cause, apart from any conclusions drawn by a trial judge or other appellate court, to ensure that the constitutional criteria established to safeguard Fourth Amendment rights have been respected. *See Ker v. California,* 374 U.S. 23, 34, 83 S.Ct. 1623, 10 L.Ed.2d 726, 738 (1963)."); *State v. Vaughn,* 12 Ariz.App. 442, 471 P.2d 744 (1970); *People v. Baird,* 172 Colo. 112, 470 P.2d 20 (1970), *citing Sirimarco v. United States,* 315 F.2d 699 (10th Cir.1963), *cert. denied,* 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1032 (1963); *State v. Vanzant,* 14 Wash.App. 679, 544 P.2d 786 (1975); *see generally* 1 W. LaFave, *Search*

*and Seizure: A Treatise on the Fourth Amendment*
§§ 1.2(g), 3.2(b) (1978).

Although both officers testified that if appellant had attempted to leave he would have been restrained and/or pursued, I cannot agree with the Majority that appellant was under arrest at the moment he was told to exit the store, since he was not free to leave the scene. Rather, the actions of Officers Stiger and Casey in approaching and directing him to step outside "constituted permissible investigative activity as described in *Terry,* and appellant was placed under arrest only upon the officers' discovery of the [cocaine] concealed on his person." *Lewis v. United States,* D.C.App., 399 A.2d 559, 560 (1979).

Furthermore, I believe that the police were aware of sufficient facts to warrant a brief investigatory stop of the appellant on the morning of April 7, 1980 "in order to determine his identity or to maintain the status quo momentarily while obtaining more information ...." *Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. at 1923. In the case at bar, minutes before the police arrived at the 7-Eleven they had received information via the radio that two men, *one carrying a firearm,* were on the premises. The call was answered in the early morning hours and there was no one else in the store, except for the cashier and manager, both of whom the police recognized from previous visits. After entry onto the premises, Officers Stiger and Casey secured a *firearm* secreted on Mr. Viola, an individual appellant stated he was "waiting for" and referred to as his "buddy." "Under these circumstances '[i]t would have been poor police work indeed for an officer ... to have failed to investigate this behavior further.' *Terry v. Ohio,* 392 U.S. at 23, 88 S.Ct. at 1881." *State v. Flynn,* 92 Wis.2d 427, 434, 285 N.W.2d 710, 713 (1980); *see also Commonwealth v. Dennis,* 289 Pa.Super. 305, 433 A.2d 79 (1981). In other words, the police in this case were reluctant to let appellant free to leave as neither his identity nor (actual) purpose had been determined; and it was not unreasonable to believe, for no evidence to the contrary exists, that

appellant may have been carrying a weapon. At the same time, the police were reluctant to arrest appellant on the basis of the information known to them at this time. Rather than force the police to choose between such opposite responses, I find the use of the intermediate response such as the one used in this case—directing appellant to step into the parking area—to have been eminently proper. *See Commonwealth v. Sheridan*, 292 Pa.Super. 278, 437 A.2d 44 (1981) (BROSKY, J.). This view is in accordance with that expressed by the well-known commentator Wayne R. LaFave in his work *Search and Seizure: A Treatise on the Fourth Amendment* § 9.3 at 77–78, where he has noted his agreement with the actions of the police when confronted with a situation analogous to the one *sub judice; viz.:*

> "Still another situation, and one which provides a rather unique opportunity to juxtapose the standards for arrest with those required for a temporary seizure for investigation, arises when an individual is suspected because of his companionship with another who has just been lawfully arrested. Assume, for example, that *A* has just been arrested while in the process of committing a crime. While the possibility that his companion *B,* may also be arrested is greater than would be the case if *A* were being arrested for an offense committed at some time in the past, it does not follow that *B* may always be arrested too. As noted earlier, it is necessary to distinguish between those instances in which there is evidence of a 'common design' between *A* and *B,* on the one hand, and those in which *A*'s offense might well have been unknown to *B* and their 'meeting is not secretive or in a suspicious hide-out,' on the other. *In the latter case the probabilities are not sufficient to allow the arrest of B, but it would seem that the fact of companionship at the time the crime was committed or perhaps even at some later time would raise a sufficient possibility that B was involved so as to justify a stopping of B incident to A's arrest."* (Emphasis added) (Footnotes omitted)

The record also reflects that Officer Stiger was able to point to specific and articulable facts which reasonably warranted his frisk of appellant. Appellant was in the company of an individual who was unlawfully carrying a weapon. The weapon was concealed under Viola's sweater, and it reasonably may be inferred that the presence of the weapon was apparent to appellant. *See Lewis v. United States, supra.* Appellant and his companion appeared to be more than just casual acquaintances, since the police heard Viola referred to by appellant as his "buddy." Therefore, when Officer Stiger observed a "bulge" in the pocket of appellant's jacket, under the totality of the circumstances, the "officer [was] entitled to conduct a limited weapons search of [the] person whom he ha[d] justifiably stopped." *State v. Flynn, supra,* 92 Wis.2d at 435, 285 N.W.2d at 713.

Moreover, it is quite reasonable to assume, and there is no contrary evidence in the record, that the officer who searched the appellant was of the opinion that such a prophylactic measure was necessary to avert the possibility that Hook would draw a weapon in an attempt to free Viola from police custody. *See United States v. Poms,* 484 F.2d 919 (4th Cir.1973); *United States v. Del Toro,* 464 F.2d 520 (2nd Cir.1972).

It does not follow from the facts that merely because the radio bulletin only reported that one of the two men at the 7-Eleven was armed, and that Hook was cooperative, that Officer Stiger was not justified in stopping and frisking appellant. *See State v. Flynn, supra.* In fact, as one court has noted in a context similar to the case at bar, "[t]he fact that [appellant's] companion had just been arrested for unlawful possession of a firearm is a particularly compelling justification for the frisk of appellant." *Lewis v. United States, supra,* 399 A.2d at 561. Faced with a comparable situation in *United States v. Berryhill,* 445 F.2d 1189, 1193 (9th Cir.1971), the Ninth Circuit Court of Appeals stated:

"In *Terry v. Ohio,* [*supra* ], the Court affirmed the right of a limited search 'to assure * * * that the person with

whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him' despite the absence of probable cause for an arrest. We think that Terry recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. *It is inconceivable that a peace officer effecting a lawful arrest ... must expose himself to a shot in the back from defendant's associate because he cannot on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance. All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed."*[3]

*Accord United States v. Poms, supra; State v. Flynn, supra; Lewis v. United States, supra; People v. Garner,* 50 Ill.App.3d 294, 8 Ill.Dec. 357, 358, 365 N.E.2d 595, 596–597 (1977); *People v. Williams,* 28 Ill.App.3d 189, 328 N.E.2d 89, 93 (1975); *cf. United States v. Simmons,* 567 F.2d 314 (7th Cir.1977) (accepting the *Berryhill* rationale as it applies to "pat-down" searches, but refusing to extend it to searches of items within the immediate control of an arrestee's companion); *United States v. Tharpe, supra* (officer's "pat-down" search is compatible with *Terry* where he has good reason to apprehend that he was in a position of real danger from companions of an arrestee); *United States v. Vigo,* 487 F.2d 295 (2d Cir.1973) (search limited to arrestee's companion's purse justified under *Terry* ); *State v. Brazil,* 269 N.W.2d 15 (Minn.1978) (where woman arrested for selling narcotics in cafe, passenger in her car outside

3. *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), distinguished in *Berryhill,* because a different type of search in scope was involved, is distinguished from the instant case on those same grounds. Furthermore, *Di Re* was decided long before the *Terry* decision which allowed a different search on less than probable cause. *Accord People v. Williams,* 28 Ill.App.3d 189, 328 N.E.2d 89 (1975).

could not be arrested but could be detained for investigation).

Consequently, given the circumstances confronting Officer Stiger after arresting Mr. Viola, it was wholly reasonable for Stiger to suspect that appellant also might be armed and dangerous. *See Lewis v. United States, supra.* He thus was justified in subjecting appellant to "a weapons search limited in scope to this protective purpose." *Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. at 1923; *United States v. Berryhill, supra; State v. Flynn, supra; Lewis v. United States, supra.*

Based on the aforesaid and finding that appellant was "detained" in accordance with *Terry,* I would hold that the subsequent pat-down was proper and the evidence seized (cocaine) as a result thereof was admissible at trial. Since the Majority's holding is to the contrary, I respectfully dissent.[4]

---

**4.** I have reviewed appellant's other allegations raised on appeal and find them to likewise be lacking in merit, so as not to warrant the relief sought. Therefore, I would affirm the judgment of sentence.