692 A.2d 1076

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Wangyer KUE, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 17, 1996.

Decided April 22, 1997.

Jeffrey P. Shender, Philadelphia, for Wangyer Kue.

Catherine Marshall, Michael Erlich, Philadelphia, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

FLAHERTY, Chief Justice.

On July 31, 1994, Philadelphia police officer Richard Waters received a radio report that an Asian male was "armed with a gun" at the intersection of Second and Olney Streets in Philadelphia. This person was described as wearing a striped shirt. Officer Waters arrived at that location within three minutes of receiving the call and saw four Asian men standing on the highway, one of whom wore a striped shirt. He saw no

indication of criminal activity; however, the officer observed that when he arrived, the men spoke quickly to each other and looked around in different directions. The officer then stopped and frisked the four men. Kue, who was *not* wearing a striped shirt, had a .25 caliber handgun in his waistband.

Kue was arrested and charged with violating the Uniform Firearms Act, 18 Pa.C.S. §§ 6106, 6108. He moved to suppress the gun which was seized, and the suppression court denied his motion. Thereafter he was convicted by the Municipal Court of two violations of the Uniform Firearms Act and received concurrent sentences of twelve months probation for each offense.

Kue filed a petition for a writ of certiorari with the Philadelphia County Court of Common Pleas, alleging that the stop and frisk was unsupported by reasonable suspicion or probable cause. The trial court denied the petition and Kue appealed to Superior Court. The Superior Court affirmed, holding that police had met the requirement of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that in order to conduct an investigative stop, a police officer must observe or receive over the police radio information which leads him to conclude that criminal activity is afoot and that the person with whom he is dealing may be armed and dangerous. Moreover, the court held that the police officer properly conducted a protective frisk of all four men, even though Kue was not the man described in the radio broadcast, for he was justified in believing that any of the men might pose a danger to him. In short, the officer possessed a reasonable suspicion "that one of the men was carrying a gun," and based on this suspicion, he was justified in conducting a protective frisk of all of the men.

■ We granted allocatur primarily for the purpose of considering whether the so-called companion rule, which allows police to conduct a pat-down search for weapons on a companion of a person suspected of criminal activity, is com-

patible with the Pennsylvania Constitution.[1] Because of our analysis of the case, however, we do not reach this question.

■ The rules which govern when police may stop a person in order to investigate the possibility of criminal activity are set out in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In general, an investigative stop is justified only upon reasonable suspicion of criminal activity, *id.,* and a limited pat-down search for weapons may be conducted only if supported by the reasonable belief that the suspect is armed and dangerous. *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226 (1996).

■ As we held in *Commonwealth v. Hawkins,* 547 Pa. 652, 692 A.2d 1068 (1997), also decided today, in order for police to act on an anonymous tip, the *Terry* requirement of reasonable suspicion of criminal activity must still be satisfied and must be independent of the telephone tip itself.[2] Here, there was no independent reason to believe that criminal conduct was afoot, and the police officer, therefore, had no reason to search anyone, whether it was the man with the striped shirt or his companions.

The order of Superior Court is reversed.

NIGRO, J., concurs in the result.

NEWMAN, J., files a dissenting opinion in which CASTILLE, J., joins.

1. The "automatic companion rule" originated in *United States v. Berryhill,* 445 F.2d 1189 (9th Cir.1971), holding that "[a]ll companions of [an] arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed." *Id.* at 1193. This court has not yet addressed the constitutionality of this rule, although the existence of the rule was noted in our decision in *Commonwealth v. Shiflet,* 543 Pa. 164, 670 A.2d 128 (1995).

2. As we noted in *Hawkins,* however, if police know the person making the tip and the basis of his knowledge, that may supply the requisite reasonable suspicion that criminal activity is afoot. Also, if the tip is anonymous, but predictive, it may provide sufficient basis for police intervention. See *Hawkins,* 547 Pa. at 656, n.3, 692 A.2d at 1070, n.3.

NEWMAN, Justice, dissenting.

Because I believe that the police properly searched Wangyer Kue and the three other men, I respectfully dissent.

As I state in my dissenting opinion in *Commonwealth v. Hawkins*, also decided today, I again do not believe the Majority has properly weighed the safety interests of the police in its analysis pursuant to Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution in this case. I also do not believe the Majority has taken into account the grave danger that gun violence poses to our law enforcement officers and society. Therefore, I will apply here the analysis in my dissenting opinion in *Hawkins*, which includes an assessment of the true dangers that police face when they respond to a report of a "man with a gun."

At approximately 2:30 a.m. on July 31, 1994, two police officers received a report over their police radio concerning an Asian male wearing a striped shirt, carrying a gun at the intersection of Second Street and Olney Avenue in Philadelphia. The officers arrived at that location within three minutes of receiving the radio call and observed four Asian men standing on the street, one of whom was wearing a striped shirt (the suspect). As the officers approached the group, the men looked around and began conversing with each other. The officers conducted a brief stop and protective frisk of the suspect, Kue and the two other men.

I would conclude that because the police stopped the suspect within three minutes of receiving an anonymous radio call that accurately described his race, clothing and location, they could justifiably rely on the informant's tip that the suspect possessed a gun. *Commonwealth v. Hawkins*, 547 Pa. 652, 692 A.2d 1068 (1997)(Newman, dissenting). Furthermore, there was a statistical likelihood that the gun was unlicensed.[1] *Hawkins* (Newman, dissenting). The totality of the circum-

1. I also note that from 1992–1996, 76% of the 48,039 violations of the Pennsylvania Uniform Firearm Act occurred in Philadelphia. Statistics that the Pennsylvania State Police provided to the Administrative Office of the Pennsylvania Courts.

stances gave the police reasonable suspicion to stop the suspect to investigate criminal activity and conduct a protective frisk. Thus, I would find that the police officers properly searched the suspect.

Unlike the Majority, therefore, I would reach an analysis of the search of Kue pursuant to the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court created an exception to the Fourth Amendment's requirement that police have probable cause before conducting a search of a citizen. Pursuant to *Terry,* a police officer may conduct a stop and frisk of a citizen without probable cause, by providing specific and articulable facts that the person was engaging in criminal activity and then establishing an objectively reasonable belief that the individual was armed and dangerous.

The Ninth Circuit was the first court to construe *Terry* as supporting the "automatic companion" rule, which permits police officers to conduct a protective frisk of companions to arrestees. *See United States v. Berryhill,* 445 F.2d 1189 (9th Cir.1971). California police in *Berryhill* were investigating Berryhill for forging stolen checks and knew that he usually carried a weapon. Berryhill was driving a car and his wife was in the passenger seat when police stopped the vehicle to effectuate the arrest. An officer noticed that Berryhill's wife was clutching a handbag, which the officer thought might contain a weapon. Therefore, the officer searched the handbag, which contained stolen mail, but no gun. Berryhill moved to suppress the mail found in his wife's handbag, arguing that it was uncovered pursuant to an unlawful search.

The Ninth Circuit reasoned that, pursuant to *Terry,* the police may conduct a limited search for weapons when they reasonably fear that a weapon could be unexpectedly used against them. *Berryhill.* Thus, it upheld the officer's protective search of Berryhill's wife's handbag and announced the "automatic companion" rule; "[a]ll companions of the arrestee within the immediate vicinity, capable of accomplishing a

harmful assault on the officer are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed." *Berryhill*, 445 F.2d at 1193.

The Superior Court of Pennsylvania has adopted a version of the "automatic companion" rule. It has upheld a *Terry* stop and frisk of the immediate companion of an individual who the police have a reasonable belief is involved with criminal activity and is armed and dangerous. *Commonwealth v. Kearney*, 411 Pa.Super. 274, 601 A.2d 346 (1992); *Commonwealth v. Chamberlain*, 332 Pa.Super. 108, 480 A.2d 1209 (1984); *cf. Commonwealth v. Graham*, 454 Pa.Super. 169, 685 A.2d 132 (1996)(upheld stop of arrestee's companion without adopting "automatic companion" rule). In *Chamberlain*, at 1:05 a.m., Philadelphia police officers observed a motor vehicle with no left headlight and no taillights. When the officers stopped the vehicle to investigate the violations of the Motor Vehicle Code, they noticed that the driver was attempting to conceal a black handgun. The police then searched both the driver and the passenger, Chamberlain. The trial court denied Chamberlain's motion to suppress the handgun and the Superior Court affirmed. It reasoned as follows:

> 'We think that *Terry* recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a police officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from [the suspect's] associate because he cannot, on the spot, make a nice distinction between whether the other is a companion in crime or a social acquaintance.'

*Chamberlain*, 332 Pa.Super. at 114, 480 A.2d at 1212 (quoting *U.S. v. Berryhill*, 445 F.2d at 1193); *see also Commonwealth v. Hook*, 313 Pa.Super. 1, 459 A.2d 379 (1983). The Superior Court then adopted *Berryhill*'s "automatic companion" rule and held the search of Chamberlain was constitutional.

Similarly, in *Kearney*, police responded to a complaint concerning drug dealing in the 6100 block of Vine Street in Philadelphia. Police observed Kearney standing next to a

man who, on three occasions, gave an object to persons who approached him and handed him cash. After the third transaction, the two men left the corner together. The police officers, based on their experience, concluded that these were drug transactions. When they approached Kearney, he pulled a gun from his waistband and pointed it at the officers. The officers arrested Kearney and charged him with simple assault, aggravated assault, possessing an instrument of crime and carrying a firearm on a public street without a license.

Kearney made a motion to suppress the revolver on the grounds that the police did not have probable cause or a reasonable suspicion to stop him. The trial court denied his motion to suppress. The Superior Court held that there was sufficient reasonable suspicion to justify a *Terry* stop of Kearney based on *Chamberlain;*

> From the officer's testimony, it is evident that appellant [Kearney] was not merely present in a high crime area or in the vicinity of a recently reported crime. Rather, appellant [Kearney] was with a person who, it was believed, was presently engaged in selling drugs. While appellant [Kearney] contends that he did nothing but stand next to this person, that was enough to support a *Terry* stop. When a person is suspected of presently committing a crime, a reasonable suspicion develops that his companion is also involved, even though the companion's only suspicious action was being in the company of the suspect.

*Kearney,* 411 Pa.Super. at 279, 601 A.2d at 348. While I agree with the Superior Court in *Kearney* and *Chamberlain,* this Court has never considered the "automatic companion" rule.

I believe this Court should adopt the "automatic companion" rule to allow police to search the immediate companions of a person whom police have a reasonable suspicion or probable cause to believe is engaged in criminal activity and is armed and dangerous, because the rule is consistent with the protections of Article I, Section 8 and the Fourth Amendment. The United States Supreme Court has emphasized that the touchstone of a court's analysis of a search pursuant to the Fourth Amendment is always the "reasonableness in all the circum-

stances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977)(quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968)). The courts assess the reasonableness of an officer's decision to stop and frisk a citizen based on his inferences made from the circumstances in light of his personal experience. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. A court must also carefully balance the public interest with the individual's right to be free from arbitrary governmental seizures in each case. *Mimms.*

The United States Supreme Court has repeatedly found that the public interest in police safety outweighs the minimal intrusions occasioned by a *Terry* stop. *See, e.g., Terry; Mimms; Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)(police may conduct a search of the passenger seat of a vehicle for weapons). For example, in a recent decision, *Maryland v. Wilson*, —— U.S. ——, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), Maryland police officers observed a car, with no license plate, driving approximately ten miles over the speed limit. The officers stopped the car and ordered the driver to get out of the vehicle. After noticing that the passenger, Wilson, was acting nervous, they demanded that he exit the vehicle also. As Wilson complied, an officer observed a bulge in Wilson's jacket that proved to be a .38 caliber revolver and promptly arrested him.

Wilson claimed on appeal that the police violated his Fourth Amendment rights by ordering him out of the vehicle. The United States Supreme Court disagreed. It weighed the public's interest in protecting police from becoming victims of hidden weapons during traffic stops against the invasion of a passenger's privacy interest in being ordered out of the stopped vehicle. It held that pursuant to the Fourth Amendment, an officer may order passengers to get out of a car pending completion of the police investigation of the driver's traffic violation. *Wilson.*

Just as the passengers of a stopped car may be constitutionally ordered to exit a vehicle, *Wilson*, police should be permit-

ted to stop companions of suspects being investigated pursuant to reasonable suspicion and probable cause. When police are properly searching a suspect committing a crime, they may reasonably conclude, based on their experience, that the companion's direct association with the suspect indicates that he or she is also involved in the criminal enterprise. This is particularly true where the companion is intimately linked to the criminal activity, yet does leave the scene or stop the ongoing crime. The potential for violence against police only increases when they investigate ongoing criminal activity by one person surrounded by bystanders. Therefore, pursuant to *Terry*, the police safety interests outweigh the companion's diminished privacy interest and justify a police stop of the suspect's companion.

Once the police have lawfully stopped an individual, the public's interest in protecting police from dangerous hidden weapons carried by companions to a suspect or arrestee outweighs the companion's nominal privacy interest in being free from a police frisk. It is imperative that police be permitted to frisk the immediate companions of a suspect engaged in criminal activity or face serious consequences; suspects and arrestees committed 2,907 assaults against full-time police officers last year and 353 of the assaults involved firearms, knives or other dangerous weapons.[2] Further, six Pennsylvania police officers died in the line of duty last year.[3] As this Court stated in *Commonwealth v. Morris*, 537 Pa. 417, 422, 644 A.2d 721, 724 (1994), "[o]ur constitutional safeguards do not require an officer to gamble with his life." The protective frisk of the immediate companions of a suspect being investigated pursuant to either probable cause or reasonable suspicion is thus consistent with the guarantees of the Fourth Amendment of the United States Constitution and Article I, Section of the Pennsylvania Constitution.

**2.** Statistics that the Pennsylvania State Police provided to the Administrative Office of the Pennsylvania Courts.

**3.** *"California tops in officers' deaths,"* United Press International, December 31, 1996.

678

Here, the police officers were outnumbered two to one on a dark street in North Philadelphia at 2:30 a.m. An officer testified at the suppression hearing that the four men on the corner were speaking rapidly with one another and looking around. The men could have easily passed the gun from one to another before the officers arrived. In this situation, the officers relied on their experience in concluding that Kue and the suspect were acting together and, based on the tip, could be armed and dangerous. Thus, pursuant to *Terry* and the "automatic companion" rule, I would find that the police officers reasonably stopped and frisked Kue.

CASTILLE, J., joins in this dissenting opinion.