J-A09013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MALIK NOEL, | |
| Appellee | No. 1087 EDA 2014 |

Appeal from the Order Entered March 13, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006259-2013

BEFORE:  BOWES, DONOHUE, AND STABILE, JJ.

MEMORANDUM BY BOWES, J.:                     **FILED JUNE 17, 2015**

The Commonwealth appeals from the order entered March 13, 2014,

granting Malik Noel's motion to suppress.  After careful review, we reverse.

The suppression court relayed the following facts.

On February 14, 2013, at 2:59 pm, in the 3000 block of North 22nd Street, Police Sergeant William Schmid received three separate radio calls regarding anonymous tips of a black male in the area with a gun.  The first radio call described a black male, medium complexion, white thermal shirt, black coat, bushy hair, and 30 years old, who arrived in a red and black Charger and went into a barbershop.  The second radio call described a black male wearing a white jacket and blue jeans, who was armed, and went into a barbershop.  The third radio call described a black male wearing a black jacket, white thermal top, blue jeans, and black shoes, with a gun on his hip.  All of the radio calls were from anonymous sources.

Sergeant Schmid and his partner arrived on the 3000 block of North 22nd Street one to two minutes after receiving the radio call.  They initially entered a women's hair salon on the first floor

of 3033 North 22nd Street. Sergeant Schmid inquired if anyone in the hair salon had called regarding a person with a gun. A female inside the salon said they had not called. The officers were ready to walk back outside when the female asked if the officers were aware that there is a barbershop upstairs. The officers went back outside and opened the door next to the door that opened the salon. The other door led to the second floor of the same building where the salon was located.

The officers walked up the stairs to the second floor and entered a barbershop on the second floor of 3033 North 22nd Street. The barbershop was a single, open room with two barber chairs. Each chair was occupied by a customer whose hair was being cut by a barber. As he stepped inside the barbershop, Sergeant Schmid looked to see if anyone in the shop matched the anonymous flash information. He also inquired if anyone had called the police regarding a person with a gun. Nobody in the barbershop responded.

Sergeant Schmid then observed Defendant, who was seated facing away from the sergeant in a barber's chair, with his back to the sergeant, and wearing a barber's cape. Defendant was getting his haircut by one of the barbers. Defendant's arms were outside the barber's cape, and Sergeant Schmid observed that Defendant was wearing a white thermal shirt.

When Sergeant Schmid made these observations, both of Defendant's arms were resting on the arm rest of the barber chair. Sergeant Schmid also observed Defendant "take his left hand and start to slide it down between himself and the arm of the barber chair, starting to go under the black cape, that was draped over." As he closed the less than 10 feet to the chair, Sergeant Schmid said to Defendant, "Let me see your hand." He then pinched the cape and tossed it off of Defendant. When he pinched the cape, Defendant's left hand was under the cape.

Sergeant Schmid explained that he removed the cape because:

> The male fit the description for the person with the gun, there were multiple calls. He was the only one in the location that fit the description and he was concealing his

hand under the barber cape. *I didn't know what he was going for or what he was doing with his hand. I didn't know if he was reaching for a weapon or trying to conceal something, drugs or gun. I don't know what he was doing*.

Sergeant Schmid also testified that—when Defendant moved his hand—he was not reaching or grabbing at any specific pocket or area. Rather, Defendant simply moved his hand from on top of the cape to underneath the cape and rested his hand under the cape on the arm of the barber chair.

After the apron was thrown off, Defendant leaned forward in the chair. As he leaned forward, Sergeant Schmid saw the outline of a very large handgun protruding from Defendant's waistband. Sergeant Schmid recovered the gun and arrested Defendant.

Suppression Court Opinion, 8/13/14, at 1-3 (emphasis in original) (internal citations omitted).

The Commonwealth charged Appellee with person not to possess a firearm, carrying an unlicensed firearm, carrying a firearm in public in Philadelphia, and receiving stolen property. The non-firearms violation was dismissed at a preliminary hearing. Thereafter, on March 13, 2014, Appellee litigated a suppression motion "under Article One, Section Eight of the Pennsylvania Constitution." N.T., 3/13/14, at 5.[1] Specifically, Appellee argued that "police lacked reasonable suspicion to stop and frisk the

---

[1] Appellee did not file a written motion. However, the Commonwealth did not object below, and since it raises the issue for the first time on appeal, such a position is waived. *See* Pa.R.A.P. 302(a). Moreover, the Commonwealth did not forward this contention in its Rule 1925(b) concise statement of errors complained of on appeal.

defendant[.]" *Id*. According to Appellee, the anonymous information received by the police did not warrant the seizure and search. The suppression court agreed, concluding:

> The anonymous source has, in my view, no indicia of [re]liability and although the defendant marginally fits part of the flash, that was he was a black male, wearing a tan to beige shirt with blue jeans, there's insufficient information to corroborate the anonymous tip. I'll also regard—give appropriate regards to the area of arrest, which was inside of the barber shop, that this sergeant was not aware of—known for any criminal activity. Although, certainly the area itself is a high-crime area. This is like—unlike most of the cases, where there is due regard for the area of arrest, which would be on the street or corner or somewhere out in the public. This was actually inside private property, in a second floor, in a private business.
>
> I'll also make a finding that there's no movement by the defendant to suggest that he had a weapon or was armed and dangerous. The sergeant did not observe any bulge, any shape of a weapon prior to the defendant being seized and there was no failure to comply with any instruction or orders given by the officer and no nervousness displayed by the defendant.

N.T., 3/13/14, at 63-64.

This appeal ensued. The Commonwealth's sole contention on appeal is:

> Did the suppression court err by suppressing the gun that experienced police officers recovered from defendant's person in a frisk where he invited reasonable suspicion by concealing his hand under a barber's cape as the officers approached him in a violent, high-crime area in response to flash information describing a gunman with his appearance?

Commonwealth's brief at 1.

- 4 -

This Court evaluates the grant of a suppression motion under well-established principles. We consider the evidence of the defendant, as the prevailing party below, and any evidence of the prosecution that is uncontradicted when examined in the context of the suppression record. *Commonwealth v. Peterson*, 17 A.3d 935, 937 (Pa.Super. 2012). This Court is bound by the factual findings of the suppression court where the record supports those findings and may only reverse when the legal conclusions drawn from those facts are in error. *Id*. Importantly, we are not bound by the legal conclusions of the suppression court. *In re T.B.*, 11 A.3d 500, 505 (Pa.Super. 2010).

We begin by noting that in considering interaction between law enforcement and other citizens, Pennsylvania courts look to whether the subject interaction is a mere encounter, an investigatory detention, or a custodial detention, *i.e.*, an arrest. A mere encounter does not require police to have any level of suspicion that the person is engaged in wrongdoing. *Commonwealth v. Downey*, 39 A.3d 401, 405 (Pa.Super. 2012). At the same time, such an encounter does not carry any official compulsion for the party to stop or respond. *Id*. An investigative detention, however, subjects an individual to a stop and short period of detention. *Id*. This seizure does not involve actions that are so coercive as to comprise the equivalent of an arrest. *Id*. To conduct an investigative detention, police must have reasonable suspicion of criminal activity. *Id*.

- 5 -

"[T]his standard is met 'if the police officer's reasonable and articulable belief that criminal activity was afoot is linked with his observation of suspicious or irregular behavior on behalf of the particular defendant stopped.'" ***Commonwealth v. Kearney***, 601 A.2d 346, 348 (Pa.Super. 1992) (citing ***Commonwealth v. Espada***, 528 A.2d 968 (Pa.Super. 1987)). It is well-settled that "[m]ere presence near a high crime area or in the vicinity of a recently reported crime, is not enough to warrant a ***Terry***[2] stop." ***Id***.  Nonetheless, it is also established that "even a combination of innocent facts, when taken together, may warrant further investigation[.]" ***Commonwealth v. Kemp***, 961 A.2d 1247, 1255 (Pa.Super. 2008) (*en banc*)); ***see also Commonwealth v. Cook***, 735 A.2d 673, 676 (Pa. 1999). As this Court cogently stated in ***Commonwealth v. Riley***, 715 A.2d 1131, 1135 (Pa.Super. 1998), "Merely because a suspect's activity may be consistent with innocent behavior does not alone make detention and limited investigation illegal. . . .  Rather, we view the circumstances through the eyes of a trained officer, not an ordinary citizen."

We consider what level of interaction occurred under a totality of the circumstances test.  ***Commonwealth v. Williams***, 73 A.3d 609, 615-616 (Pa.Super. 2013).  This standard is an objective one and looks to the reasonable belief of the citizen and not the subjective view of law

---

[2] ***Terry v. Ohio***, 392 U.S. 1 (1968).

enforcement. ***Commonwealth v. Lyles***, 54 A.3d 76, 83 (Pa.Super. 2012). "In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained." ***Id***. at 79-80. Accordingly, we look to whether "in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave." ***Id***. at 79.

The Commonwealth maintains that the suppression court "disregarded the totality of the circumstances." Commonwealth's brief at 7. It asserts that "an eleven-year veteran police sergeant responsible for hundreds of gun arrests in the violent, high crime neighborhood in this case testified that [Appellant] fit the physical description and wore the clothing described in a police radio call of a 'man with a gun.'" ***Id***. In addition, the Commonwealth notes that Appellant moved his hand under the barber's cape after police entered the room and asked if anyone had called about a person with a gun.

The Commonwealth continues that the suppression court did not properly consider that this case involved three separate anonymous phone calls describing a black male with a gun entering a barbershop. Two of those calls identified the person as wearing a light colored thermal shirt. The Commonwealth, in a post-submission communication filed with permission from this Court, relies on three separate cases to argue that the anonymous calls, in conjunction with the remaining circumstances, support the warrantless seizure and search.

Specifically, the Commonwealth points to **Commonwealth v. Ranson**, 103 A.3d 73 (Pa.Super. 2014),[3] **Navarette v. California**, 134 S.Ct. 1683 (2014), and **In the Interest of D.M.**, 781 A.2d 1161 (Pa. 2001). In **Ranson**, a Pittsburgh police detective with eighteen years of experience was working as part of an approved off-duty detail at an after hours club. The club was located in a high crime area and the officer had worked security at the business for four years. As the club was closing, at approximately 3:30 a.m., a patron approached the detective and pointed out an individual whom the informant claimed had a gun. The detective did not know the informant's name, but maintained that he saw the person every weekend at the club.

The detective and two other police officers working security approached the identified person, Ranson. As the officers, who were in uniform, came near, Ranson put his hands in his hooded sweatshirt and began to walk away. The police ordered him to stop, but he continued to walk away. The original detective pulled out his firearm and held it at his side and continued to instruct the defendant to stop. After walking approximately fifty feet, the defendant turned around. The police told the

_____

[3] The Commonwealth incorrectly refers to the case as **Commonwealth v. Ransom** and failed to provide the citation to the case. However, it is evident from the Commonwealth's recitation of the facts of that case, that it is discussing the case we reference.

defendant to remove his hands from his sweatshirt. The defendant complied, at which point police could see the outline of a gun. Police discovered a handgun in the front pocket of Ranson's sweatshirt.

This Court upheld the stop and search. First, the panel noted the distinction between the typical anonymous tip where police have no information as to whom the tipster is and the situation presented therein. Since the tip was given in person, we concluded it had more indicia of reliability than the traditional anonymous tip. We added that the stop occurred in a high crime area and that Ranson had walked away after seeing police approach him.

*Naverette*, in contrast, involved a motor vehicle stop. There, police received an anonymous 911 call identifying a silver Ford pickup truck with a specific license plate as having run the caller off the road five minutes earlier. Approximately thirteen minutes later, police observed the truck in question. Police followed the vehicle for five minutes. Although the police did not observe any driving infractions, they elected to stop the car. Ultimately, the police discovered thirty pounds of marijuana in the vehicle. The United States Supreme Court, in a five-to-four decision, upheld the stop. The majority ruled that the 911 call was sufficiently reliable and provided reasonable suspicion for the traffic stop.

In *D.M.*, the Pennsylvania Supreme Court in a four-to-three decision upheld a search after police received an anonymous tip describing a man

with a gun at a precise location. Police responded to the location, where they saw and identified D.M, who matched the description provided to police. Upon seeing police, D.M. fled. Originally, the Pennsylvania Supreme Court ruled the stop illegal under the Fourth Amendment and the Pennsylvania Constitution. The United States Supreme Court vacated that decision. The *D.M.* Court, upon remand, ruled that the anonymous tip, coupled with flight, warranted the stop.

Appellee counters that police lacked specific and articulable facts necessary to reasonably conclude he was armed. He contends that he was lawfully sitting in a barber chair during the day time, getting a haircut, and that he only marginally matched the descriptions given by the anonymous callers. Appellee adds that the suppression court did not find his hand movement to be furtive as he merely placed his hand underneath the barber cape and there was no indication that he was reaching for anything.

Appellee continues that the officer here only had a hunch that Appellant was the individual identified by the anonymous calls. He asserts that "the mere fact that a person fits a vague description given by an anonymous source does not constitute sufficient basis for a *Terry* search because tips are unreliable and therefore are treated with suspicion." Appellee's brief at 12. In support, Appellant relies principally on *Commonwealth v. Wiley*, 858 A.2d 1191 (Pa.Super. 2004).

In **Wiley**, at noon, a person saw Wiley inside a restaurant with a gun in his waistband. The concerned citizen followed the defendant and saw him enter a barbershop. The tipster called 911 and described the defendant as a five-foot-seven-inch black male, approximately twenty-five years of age. He indicated that he saw the defendant in the restaurant with a gun and observed him walk into a barbershop. He provided the address of the barbershop. The tipster remained at the scene until police arrived and, after Wiley was arrested, told police that he had called. The police responded to the barbershop within one and one-half minutes of the call. An officer who was familiar with the barbershop entered the business with his gun drawn and directed Wiley to raise his hands. Police recovered a loaded .22 caliber revolver.

A panel of this Court ruled that the police action therein was unlawful. Since police did not learn of the caller's identity until after Wiley was arrested, we viewed the tip as anonymous. The **Wiley** Court reasoned that the single anonymous tip alone was insufficient to justify the seizure. The Court held that the mere corroboration of Wiley's features with the information from the call did not create reasonable suspicion.

Preliminarily, we find that none of the cases relied on by the Commonwealth are particularly apt, nor are they controlling. **Ranson** involved an in-person identification. **Naverrette** relates to a motor vehicle stop and in **D.M.**, the suspect attempted to flee. Nonetheless, we disagree

with Appellee that ***Wiley*** compels affirmance. Unlike ***Wiley***, this case involves multiple tips and the officer did not enter the barbershop with his weapon drawn. Further, Appellee moved his hand to where police could not see it when they asked if anyone had called to report a person with a gun. Thus, we are faced with a novel factual scenario.

As Appellee litigated his motion solely under Pennsylvania constitutional principles, we focus on Article I, § 8. That provision provides,

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed by the affiant.

Pa.Const., Article I, § 8. "[I]n several contexts, the Pennsylvania Supreme Court has interpreted Article I, § 8 to afford broader protections than interpretations of the Fourth Amendment by the United States Supreme Court." ***Commonwealth v. Haynes***, 2015 PA Super 94, *5 (collecting cases). "However, in other situations, our High Court has declined to interpret Article I, § 8 as providing greater protections than the United States Supreme Court's Fourth Amendment jurisprudence." ***Id***. at *6. The law governing ***Terry*** stops, *i.e.*, stops and searches based on reasonable suspicion, is the same under both the federal and Pennsylvania charters. ***See Wiley***, ***supra***; ***see also Lyles***, ***supra*** at 302.

Both the U.S. Supreme Court and Pennsylvania Supreme Court have opined that the hallmark of any search or seizure is reasonableness. **Brigham City v. Stuart**, 547 U. S. 398, 403 (2006); **Commonwealth v. Lagenella**, 83 A.3d 94, 102 (Pa. 2013) ("The Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution, protect individuals from unreasonable searches and seizures."). Accordingly, warrantless intrusions are generally considered unreasonable. **Haynes**, **supra** at *3; **Commonwealth v. Davido**, 106 A.3d 611, 622 (Pa. 2014) ("Warrantless entries or searches are *per se* unreasonable under our federal and state Constitutions, albeit subject to certain delineated exceptions.").

Indeed, "[f]raming-era law enforcement could only justify felony warrantless arrests if a felony in fact had been committed, and such an arrest was ordinarily required to be based on exceptional circumstances." **Haynes**, **supra** at *9. Hence, where a person was seen to have committed a felony by the officer or citizen, he could be stopped and arrested. **Id**. (citing **Wakely v. Hart**, 6 Binn. 316 (Pa. 1814)). In addition, "although not seen, yet if known to have committed a felony, and *pursued* with or without warrant, he may be arrested by any person." **Wakely**, **supra** at 318 (emphasis in original); **see also Haynes**, **supra** at *9 (citing William Waller Hening, The New Virginia Justice, 51 (Richmond, 2nd ed. 1810), stating, "a constable hath no power to arrest a man for an affray done out of his own

- 13 -

view, without a warrant from a justice, unless a felony were done, or likely to be done").

"Since the constitutional prohibitions against general warrants was because such warrants provided discretionary authority to constables, customs officers, and other peace officers, 'it is wholly implausible that the Framers would have approved of broad use of warrantless intrusions, because such intrusions would necessarily have rested solely on the officers' own judgment.'" **Haynes**, **supra** at *10. Pointedly, law enforcement could not enter a private home or business to conduct a search of a person or the place without a warrant unless the official believed that violence was occurring inside or he was in fresh pursuit of a person he observed commit a felony or affray. **Id** at *11. As this Court stated in **Haynes**, "at the time of Pennsylvania's early constitutions, it was generally recognized by the people that an unreasonable search and seizure occurred unless a specific warrant authorized the search or seizure." **Id**. Thus, **Terry** seizures based on reasonable suspicion of criminal activity find little to no support in the text or early history of the Pennsylvania Constitution's prohibition against unreasonable searches and seizures. **See generally Haynes**, **supra** (discussing historical underpinnings of warrantless search and seizure law).

However, the cases from both the Pennsylvania Supreme Court and this Court upholding **Terry** searches are too legion to cite. As outlined previously, police must have reasonable suspicion that criminal activity is

afoot, which is evaluated by the courts based on the totality of the circumstances. Our state Supreme Court and the U.S. Supreme Court have addressed reasonable suspicion in the context of a single anonymous tip. *Commonwealth v. Hawkins*, 692 A.2d 1068 (Pa. 1997) (OAJC), *Commonwealth v. Kue*, 692 A.2d 1076 (Pa. 1997) (OAJC), and *Commonwealth v. Jackson*, 698 A.2d 571 (Pa. 1997), *Florida v. J.L.*, 529 U.S. 266 (2000). The plurality decisions in *Hawkins* and *Kue* were decided on the same date with the votes of the justices involved being identical.

In *Hawkins*, Philadelphia police received information from an anonymous source that a black male wearing a blue hat, black jeans, and a gold or brownish coat was at Sydenham and York Streets with a gun.[4] Police arrived within three minutes to that precise location and observed Hawkins. Hawkins matched the description given. Accordingly, the officer stopped and frisked Hawkins, "finding a .22 caliber revolver in his waistband." *Hawkins*, *supra* at 1069. The *Hawkins* plurality[5] ruled the stop illegal. The plurality opined that when police "respond to an anonymous call that a particular

---

[4] The Pennsylvania Supreme Court decision does not reference the time of day that the stop occurred. However, this Court's unpublished memorandum set forth that the stop occurred at approximately 8:40 p.m.

[5] Chief Justice Flaherty authored the lead opinion and was joined by Justices Cappy and Zappala. Justice Nigro concurred in result and Justice Newman authored a dissenting opinion joined by Justice Castille.

person at a specified location is engaged in criminal activity, and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the caller accurately described someone at a particular location." *Id*. at 1070. The *Hawkins* Court also found that the officer "had no independent reason to believe that the suspect may have been involved in criminal activity." *Id*. at 1071.

Similarly, in *Kue*, police received an anonymous tip at 2:30 a.m. that "an Asian male was 'armed with a gun' at the intersection of Second and Olney Streets in Philadelphia." *Kue*, *supra* at 1077. The tip described the individual as wearing a striped shirt. The responding officer arrived at the scene within three minutes and saw four Asian men, one of whom was wearing a striped shirt. Kue, the defendant, was not the individual in the striped shirt. The officer witnessed the men speak quickly to each other and look in different directions. He then stopped and frisked each man. The search of Kue revealed a .25 caliber firearm in his waistband.

Utilizing the same rationale as the *Hawkins* plurality, the *Kue* plurality ruled that the stop and frisk was illegal. Specifically, it held that "in order for police to act on an anonymous tip, the *Terry* requirement of reasonable suspicion of criminal activity must still be satisfied and must be independent of the telephone tip itself." *Id*. at 1078. Since "there was no independent reason to believe that criminal conduct was afoot," the officer "had no reason to search anyone[.]" *Id*.

While the **Hawkins** and **Kue** decisions were pluralities, the High Court reached a majority consensus in **Jackson**, **supra**. Therein, "[a]t approximately 10:23 p.m., a Philadelphia police officer received a police radio report of a man in a green jacket carrying a gun. Other than the location, no additional details were provided." **Jackson**, **supra** at 572. Within two minutes of receiving the call, police arrived at the corner of Snyder and Seventh Street where the person was alleged to be located. The defendant was the only individual in a green jacket. There was no evidence that he acted suspiciously. However, the officer stopped the defendant and searched him. While the defendant was being searched, a small key box fell next to him, which contained fourteen packets of cocaine.

The majority ruled that the case was factually indistinguishable from **Hawkins**. It reasoned that the fact that the police were able to corroborate the location of the suspect and his wearing of a green jacket was insufficient to warrant a **Terry** stop. The **Jackson** Court rejected the Commonwealth's argument "that the degree of danger to the police and the public from armed criminals is so great that if an anonymous caller provides a physical description of the individual, an accurate location and an allegation that the individual is armed, a **Terry** stop is justified." **Id**. at 575. Instead, it ruled, "[t]he danger to the police and public from firearms was already factored into the balance when the requirement of reasonable suspicion was articulated in **Terry**." **Id**.

Consistent with our High Court's expression in **Jackson**, the United States Supreme Court in **J.L.** ruled that an anonymous tip that a person is carrying a gun is, without additional evidence, insufficient to uphold a police officer's stop and frisk. In **J.L.**, police received an anonymous tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." **J.L.**, **supra** at 1377. Two officers responded and observed three black males in the area. J.L, a juvenile, was wearing a plaid shirt. "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements." **Id**. Despite not observing any suspicious behavior, one officer directed J.L. to place his hands up, frisked him, and found a gun. The Supreme Court rejected creating a firearm exception to **Terry**, and ruled that the stop and search violated the Fourth Amendment.

In the present case, police received three separate anonymous tips, all of which identified a black male with a gun entering a barbershop. Two of the tipsters identified the individual as wearing a white thermal shirt. Officer Schmid, with eleven years experience, including six in the district in question, observed Appellee in the barbershop and described him as matching the description given. It is undisputed that Appellee was wearing a white thermal shirt. The barbershop is located in a high crime neighborhood. After Officer Schmid asked if anyone had called about a

person with a gun, Appellee moved his hand under the barber's cape concealing it from the Officer Schmid's view. The officer asked Appellee to show his hands, and lifted the barber's cape. Appellee leaned forward to stand up, revealing the weapon. Although Appellee's hand movement was not illegal, even activity consistent with innocent behavior may be considered as giving rise to reasonable suspicion. Thus, this case is distinguishable from those cases that suppressed evidence seized as a result of receiving one anonymous tip without additional *indicia* of criminal activity.

We add that we do not find that the number of anonymous tips received provides a greater *indicia* of reliability than a single tip. The tips remained anonymous, and one person may in fact provide multiple tips. The number of tips is simply not dispositive nor is it enough that police corroborate that a person matches the description of an anonymous tipster or tipsters. Rather, police must be able to articulate specific facts giving rise to a reasonable belief that the person matching the description by the tipsters is engaged in criminal activity. We hold that under the totality of these circumstances, police did have reasonable suspicion to detain Appellee. Accordingly, we find that the suppression court erred.

Order reversed. Case remanded. Jurisdiction relinquished.

Judge Stabile joined the memorandum.

Judge Donohue filed a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/17/2015