**STATE of Minnesota, Respondent,**

v.

**Robert FERRISE, et al., Appellants.**

**No. 47881.**

Supreme Court of Minnesota.

Aug. 18, 1978.

Rapoport, Singer & Miller, Aurelio Nardi, St. Paul, for appellants.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, David W. Larson and Lee W. Barry, Asst. County Attys., Minneapolis, for respondent.

Heard before ROGOSHESKE, KELLY, and MacLAUGHLIN, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

This is an appeal pursuant to Rule 29.02, subd. 3, Rules of Criminal Procedure, which allows discretionary appeals only in the "interests of justice," by a defendant from a pretrial order denying the suppression of evidence. We affirm.

---

Early on December 3, 1976, Deputies Edward Neubauer and Dan Dunlevy of the Hennepin County Sheriff's Department were on routine patrol on Highway No. 55, which is a divided highway, when they received a radio communication indicating that a robbery had occurred at the Hanson House. A short time later the deputies, who were traveling west, observed a car being driven in the wrong direction in their lane. Deputy Dunlevy swerved to avoid a collision with the approaching car, which then turned onto a turn-around area and headed east on Highway No. 55 in the eastbound lane. Deputy Dunlevy made a U-turn and signaled the driver of the car to stop, which he did immediately. Deputy Dunlevy stopped 8 to 10 feet behind the car.

Deputy Neubauer then got out and walked toward the stopped car. About the same time defendant Klotter, the driver, stepped out of the stopped car and met Deputy Neubauer halfway between the two vehicles. In response to the deputy's questioning, defendant Klotter stated that he had no identification or driver's license in his possession but that he did have a driver's license. Deputy Neubauer then patted down defendant Klotter and, finding no identification, requested that defendant step inside the police van so that they could verify by radio his claim to a driver's license. While placing defendant in the police van Deputy Neubauer asked if there was anyone in the car. Defendant replied that a friend was with him. The deputy explained his next actions on direct examination at the Rasmussen hearing as follows:

"Q. What was your reason for going back to the passenger door on the vehicle?

"A. The driver had no identification. When I patted him down I felt no wallet. And he said he had no identification or driver's license. So I thought that if there was a passenger in the car, perhaps I could get some identification from him, and by doing that we could identify the driver, assist in identifying the driver basically.

"Q. So you came up to the passenger door of the vehicle?

"A. Yes, I did.

"Q. And what was the first thing you did when you were there?

"A. When I went up to the passenger door?

"Q. Yes.

"A. I reached over and opened the door.

"Q. Was there any type of visual signal or any type of verbal communication before opening the door?

"A. I could not see inside the door.

"Q. The passenger door window was covered with snow?

"A. The entire car was covered with snow, yes. It was dark inside there. I don't recall if it was all the way up, the snow, but I could not see the person inside.

"Q. You opened the door. What happened then?

"A. I opened the door and upon opening the door the light went on in the car, but the first thing I saw was a gun, a long-barreled gun sitting between the door and the seat, right on the floor between the car door and the seat."

Deputy Neubauer grabbed the gun, removed the passenger, patted him down, and then brought him back to the police van. While placing the passenger in the van Deputy Neubauer heard another radio communication concerning the Hanson House robbery, this to the effect that two weapons, one long-barreled and one short-barreled, had been used in the robbery. The deputy then removed defendant Klotter from the van for a second patdown to make sure that he did not have a weapon. Since the weapon he had grabbed was long-barreled, Deputy Neubauer then got back in the van and requested the broadcast of the entire transmission concerning the Hanson House robbery. The information he received was that two persons of medium height, wearing ski masks and dark clothing, were involved in the robbery. Deputy Neubauer mentally noted that the description given matched somewhat that of the two men he had placed in the van. Prior to

receiving this last transmission the deputy had not suspected the two men of any involvement in the Hanson House robbery.

After calling for assistance Deputy Neubauer walked back to the stopped car and saw through the open door what appeared to be a ski mask lying against the hump on the floor of the front seat. Picking up the ski mask, the deputy looked inside and found another ski mask and a short-barreled weapon. Shortly after these additional items were seized, the two men were identified, advised of their rights, and transported to the Hennepin County Jail. The vehicle was taken into police custody and subsequently searched pursuant to a search warrant.

The decisive issue for determination is whether Deputy Neubauer's conduct of opening the passenger door, seizing certain evidence, and taking the passenger into custody was constitutionally permissible. The determinative case, in our opinion, is *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In that case, the United States Supreme Court was presented with the issue of the permissibility under the Fourth Amendment of a police practice of routinely ordering drivers out of automobiles lawfully stopped for minor traffic violations. In upholding the practice against the Fourth Amendment challenge, the court followed the now familiar balancing approach for determining the reasonableness of the police action.[1] The proffered justification for the police practice of ordering lawfully stopped drivers to get out of their cars was that "[e]stablishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault." 434 U.S. 110, 98 S.Ct. 333, 54 L.Ed.2d 336. Terming this justification

"both legitimate and weighty," the court balanced it against "the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car." 434 U.S. 111, 98 S.Ct. 333, 54 L.Ed.2d 337. The court characterized this additional intrusion as being "de minimis." Concluding its analysis, the court stated that "what is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." 434 U.S. 111, 98 S.Ct. 333, 54 L.Ed.2d 337. Because the police order was proper, the court upheld Mimms' conviction, since the evidence on which the conviction (for a possessory weapons offense) was based was properly seized pursuant to a lawful weapons frisk necessitated by the officer's observation of a bulge in Mimms' coat when he alighted from the vehicle.

If an officer orders a driver to get out of his car, as in *Mimms*, what he in effect is doing is also ordering the driver to open the door, because that is generally the only reasonable way a person can get out of a car. Operationally then, there is little practical difference between ordering a driver to open his door and get out of his car, on the one hand, and opening the door for the driver and telling him to get out, on the other. In this case, if the driver had not gotten out of the car on his own, the officer could have opened the door and told him to get out.

While the *Mimms* case involved only the right to order a driver to get out of the car, the *Mimms* analysis would seem also to justify a policy of ordering passengers out. The same concern of the officers for their own safety applies, and the intrusion on the rights of the passengers occasioned by being required to get out of the car is no greater than the intrusion on the rights of the driver.

1. " * * * The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends 'on a bal-

ance between the public interest, and the individual's right to personal security free from arbitrary interference by law officers.' *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)." 434 U.S. 108, 98 S.Ct. 332, 54 L.Ed.2d 335.

In this case, the officer who opened the door and told the passenger to get out did not testify that he did this pursuant to any policy or out of any concern for his own safety. The officer, however, had a good reason for going back to the car and talking to the passenger. Specifically, he wanted to see if the passenger could aid them in accurately identifying the driver so a license check could be made. Since the car was covered with snow and the officer could not see the passenger, the officer simply opened the door. While he probably could have tapped on the window to get the passenger's attention, we fail to see how this action in opening the door in order to talk with the passenger could be deemed unreasonable, especially when under the *Mimms* holding he probably could have done so whether or not he had a particular reason for wanting to talk to the passenger.

We hold that the intrusion into the passenger's privacy was minimal and that it may not prevail when balanced against the important public interests involved. The test is the reasonableness of the intrusion under all the circumstances, and in this case the minimal intrusion was completely reasonable and proper.

Affirmed.

SCOTT, Justice (dissenting).

I respectfully dissent. The majority relies upon the *Mimms* case, *supra*, which seems inappropriate. The facts in that case disclose that the police officer arrested the driver of an automobile for a traffic offense and ordered him out of the car. Upon seeing a bulge under his jacket, the officer patted him down and a weapon was found. Defendant was charged with carrying a concealed deadly weapon and of possession of a firearm without a license.

The determinative issue in the case at hand has to do with a passenger; whether Deputy Neubauer's conduct of opening the passenger door without permission, seizing certain evidence and taking the passenger into custody, and subsequently searching the car was in accord with constitutional requirements.

It is obvious that at the time of the intrusion, search, and restraint of the passenger, all the deputy knew was that a possible traffic violation had been committed by a driver of an automobile who was now in custody and that radio inquiries were being made. He admits that at this point he in no way connected the driver or his passenger with any other crime.

In the past we have quoted *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), for the proposition that "when an officer is justified in believing that an individual whose suspicious behavior he is investigating at close range is armed and presently dangerous," the officer may "stop and frisk" the suspect for weapons, and have applied this standard to certain factual settings where such was the case, allowing a passenger to be invited from the car and frisked. *State v. Brazil*, 269 N.W.2d 15 (Minn. 1978). Here, there is no evidence whatsoever supporting the investigation of this passenger for his "suspicious behavior" and no justifiable reason to search the car and take the passenger into custody. We have suggested, in *State v. McKinley*, 305 Minn. 297, 232 N.W.2d 906 (1975), that Fourth Amendment protections,[1] as articulated in *Terry, supra*, apply to automobiles. We therefore do not have the ample probable cause in this case which is required by the constitutions of both the United States and the State of Minnesota, nor the extension thereunder of the "stop and frisk" doctrine as instituted by *Terry, supra*, where the United States Supreme Court said:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized." Article I, Section 10, Constitution of the State of Minnesota.

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." Amendment IV, Constitution of the United States.

" \* \* \* We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. 30, 88 S.Ct. 1884, 20 L.Ed.2d 911.

Certainly, the facts in this case do not meet the standards laid down in *Terry* as quoted above. It is also interesting to note that in *Terry* the Court went on to say: " \* \* \* it is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the stationhouse and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U.S. 16, 88 S.Ct. 1877, 20 L.Ed.2d 903.

It seems difficult under the above to find that Deputy Neubauer "seized" the passenger and evidence while adhering to all the constitutional requirements indicated by both this court and the Supreme Court of the United States in the past. On cross-examination Deputy Neubauer candidly testified to the following:

"Q. Was there any reason why you didn't tap on the window and look in the windshield or motion the man to get out of the car?

"A. It was cold. I guess I'm basically maybe a suspicious person. I don't know. I thought—it was cold and I couldn't see inside. He said there was someone in there. I don't know why, I just opened the door.

"Q. So in other words you are admitting more suspicion than anything else?

"A. Okay."

While I agree with the trial court that this factual setting presents a very close question, I believe that allowing this search and seizure to stand as to the passenger will do violence to the law as we now understand it.

I feel that the evidence gathered from the searches of the automobile at the scene of the arrest and the seizure of the passenger must be suppressed. This of course does not preclude charges substantiated by independent evidence, if such be the case, from witnesses at the robbery scene, or from other independent sources, including evidence of the whereabouts of the driver at that time of night and a description of the driver and his car, since the first traffic arrest of the driver was proper. But under the evidence submitted, we should reverse.

ROGOSHESKE, Justice (dissenting).

I join the dissent of Mr. Justice Scott.

WAHL, Justice (dissenting).

I join the dissent of Mr. Justice Scott.