*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0388**

State of Minnesota,
Respondent,

vs.

Mya Oo,
Appellant.

**Filed February 9, 2026**
**Reversed and remanded**
**Bentley, Judge**

Chippewa County District Court
File No. 12-CR-24-290

Keith Ellison, Attorney General, Lydia Villalva Lijó, Assistant Attorney General, St. Paul, Minnesota; and

Matthew Haugen, Chippewa County Attorney, Montevideo, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Amy Lawler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schmidt, Presiding Judge; Bratvold, Judge; and Bentley, Judge.

**NONPRECEDENTIAL OPINION**

**BENTLEY**, Judge

Appellant appeals from a final judgment of conviction for controlled substance crime in the second degree—possession, in violation of Minn. Stat. § 152.022, subd. 2(a)(1) (Supp. 2023). He argues that the district court should have granted his motion to

suppress evidence that officers discovered after they expanded the scope of a traffic stop without reasonable suspicion. We agree and, for that reason, reverse.

**FACTS**

The following facts derive from the evidence admitted at a contested omnibus hearing on appellant Mya Oo's motion to suppress. The evidence included officer testimony and video footage from the officers' body-worn and squad-car cameras.

Officer B.[1] was on duty in May 2024 and conducted a traffic stop of a car with a headlight out. Officer B. approached the car, which had two occupants—the driver and a passenger in the front passenger seat. The passenger was Oo. When Officer B. initiated conversation with the occupants, there was a significant language barrier. About ten minutes into the stop, Officer Y. arrived on scene and connected with an interpreter on his phone to facilitate communication.

The officers confirmed the name of the driver and that he did not have a valid license. Oo initially told the officers that he had a driver's license, but he did not have identification on hand and wrote his name down. Officer Y. then ran the information Oo gave him and confirmed that he also did not have a license. Officer B. then expressed his intent to issue a citation. Officer Y. explained to the driver and Oo that they could not drive away because neither of them had licenses and that they would need to contact someone with a license to drive the car. Officer Y. testified that, while he was on scene, Oo "acted

---

[1] We refer to the officers by their initials instead of their full names in accordance with our rules of public access. *See* Minn. R. Pub. Access to Recs. of Jud. Branch 8, subd. 2(b) (recommending that appellate opinions limit disclosure of witness identities "to what is necessary and relevant").

fidgety and nervous with his demeanor." Oo "had rapid hand movement, would avoid . . . eye contact with officers, and would slouch and try not to look at [the officer]." After running the occupants' information, Officer B. learned that the driver had an active Wisconsin arrest warrant.

During the wait to "confirm[] the warrant with Wisconsin," Officer B. asked the driver to get out of the car. The driver complied, leaving the door partially open at about a 45-degree angle, and walked with Officer B. to the rear of the car to talk. Officer B. explained to the driver that he had a warrant in Wisconsin, but they were not planning to arrest him at that time. As they were talking, the footage from Officer B.'s squad-car camera shows that Officer Y. approached the driver's car door, began looking into the car's interior with his flashlight, opened the door the rest of the way, and stepped closer to the interior of the car.

Officer Y. then alerted Officer B. that he saw what he identified as drug paraphernalia in the pocket of the door on the driver's side. The paraphernalia was described as "a small bottle with like a straw . . . attached to it on the side as if [it was] some type of smoking device with red liquid in it." At that point, Officer B. asked the driver if there were drugs in the car and received his consent to search the car. While conducting the search, Officer Y. searched a satchel on Oo's seat and found "a large amount of methamphetamine." He asked Oo if the satchel was his, Oo said yes, and Officer Y. arrested him.

Respondent State of Minnesota charged Oo with controlled-substance crime in the second degree—possession, in violation of Minnesota Statutes section 152.022,

3

subdivision 2(a)(1). The district court held a contested omnibus hearing on Oo's motion to suppress evidence obtained in the search. At the omnibus hearing, Officers B. and Y. testified, and the district court received five exhibits including the body-worn and squad-car camera footage. In his testimony, when asked on direct examination if he "ha[d] to open the door [him]self . . . to see this meth paraphernalia?" Officer Y. said he "did not," and agreed that he "had seen it after [the driver] exited the vehicle himself and [the driver] open[ed] the door himself." On cross-examination, Officer Y. was asked if, after the driver left the car door open "at around a 45[-degree] angle," Officer Y. "immediately fully opened the door." He answered that he did "not recall if [he] did or not."

After the hearing, the district court denied the motion to suppress. In its order, the district court found, "[The driver] partially opened the driver's side door and exited the vehicle. [Officer Y.] assisted in opening the door until he noticed drug paraphernalia within the driver's side door compartment." The district court further determined, "An officer opening a car door is an expansion of the traffic stop if not tied to the original purpose of the stop." (Quotation omitted). The district court concluded, nevertheless, that the officers had reasonable suspicion to expand the stop. The district court explained:

> [T]he driver of the vehicle did not have a valid driver's license. This provided officers additional suspicion that he was driving without a license, a misdemeanor offense. Because there was an additional basis for an expansion of the traffic stop, [Officer Y.'s] decision to fully open the car door was lawful. The drug paraphernalia was in plain view to him once the door was fully open and his training and experience allowed him to identify the drug paraphernalia.

4

(Citation omitted.) The district court also determined that the satchel was a "container inside the vehicle" that could be validly searched under the automobile exception.

A jury found Oo guilty of second-degree possession. The district court sentenced Oo to 108 months' imprisonment, with credit for time served and an opportunity to serve a portion of his sentence on supervised release.

Oo appeals.

**DECISION**

The issue on appeal is relatively narrow. Oo does not dispute that, based on the headlight equipment violation, the traffic stop was justified at its inception. *See State v. George*, 557 N.W.2d 575, 578 (Minn. 1997) ("Ordinarily, if an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle."). He also does not challenge the lawfulness of the officer's request for the driver to exit the vehicle. *See State v. Askerooth*, 681 N.W.2d 353, 367 (Minn. 2004) (stating that a police officer may order a driver to exit their vehicle during a lawful traffic stop "without an articulated reason"). Rather, Oo argues that the district court should have granted his motion to suppress because Officer Y. unlawfully expanded the scope of the traffic stop by fully opening the partially open driver's side door without reasonable, articulable suspicion of criminal activity.[2]

---

[2] In the alternative, Oo argues that the drug paraphernalia visible in the pocket of the driver's side door was not sufficient to support probable cause to search Oo's satchel that was on the passenger seat in the car. As we will explain, we conclude that Officer Y. unreasonably expanded the scope of the initial traffic stop without reasonable, articulable suspicion and that the evidence seized as a result of that expansion should have been suppressed. We therefore decline to reach Oo's probable cause argument. *See Minn. Baptist*

5

We begin with a brief overview of the applicable law and our standard of review. We then consider whether Officer Y.'s conduct constituted an expansion of the stop. And, after concluding it did, we assess whether that expansion was supported by reasonable, articulable suspicion of criminal activity.

**I**

The Minnesota Constitution prohibits "unreasonable searches and seizures." Minn. Const. art. I, § 10.[3] "Warrantless searches and seizures are generally unreasonable," *State v. Taylor*, 965 N.W.2d 747, 752 (Minn. 2021), but there is an exception to the warrant requirement for limited investigatory seizures, *Askerooth*, 681 N.W.2d at 363. Under this exception, a police officer may briefly detain an individual when the officer "has a reasonable, articulable suspicion that criminal activity is afoot." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (quotation omitted). "Generally, if an officer observes a violation of a traffic law, no matter how insignificant the traffic law, that observation forms the requisite particularized and objective basis for conducting a traffic stop." *State v. Anderson*, 683 N.W.2d 818, 823 (Minn. 2004). But during that stop, an officer's actions

---

*Convention v. Pillsbury Acad.*, 74 N.W.2d 286, 296 (Minn. 1955) ("Under well-settled rules the court refrains from deciding, where it is unnecessary to do so, constitutional and other legal questions.").

[3] Oo raised his claim under both the Minnesota and U.S. Constitutions. The Minnesota Constitution has been interpreted as offering more protection from unreasonable searches and seizures during traffic stops than the U.S. Constitution. *State v. Ortega*, 770 N.W.2d 145, 152 (Minn. 2009). Because we conclude that the state constitution was violated, we do not reach the separate federal question.

must be "reasonably related to and justified by the circumstances that gave rise to the stop in the first place." *Askerooth*, 681 N.W.2d at 364.

Each incremental intrusion that is not closely related to the reason for the initial traffic stop must be "tied to and justified by" either "independent probable cause," or "reasonableness." *Id.* at 365. "Furthermore, the basis for the intrusion must be individualized to the person toward whom the intrusion is directed." *Id.* Evidence obtained in violation of the state constitution must be suppressed. *State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011); *see also State v. Babineau*, 23 N.W.3d 396, 410 (Minn. App. 2025) ("Generally, evidence obtained through an unlawful expansion of the scope of a vehicle stop must be suppressed.").

The parties agree that the applicable test in this case is the reasonableness of the incremental intrusion. The district court concluded that Officer Y.'s expansion of the traffic stop was lawful because it was supported by reasonable suspicion. "When reviewing a district court's pretrial order on a motion to suppress evidence, [appellate courts] review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quotation omitted).

With that background, we turn to Oo's arguments.

**II**

We first address whether the officer expanded the scope of the traffic stop when he opened the door fully. Minnesota caselaw has typically treated a police officer's opening of a car door as an expansion of a stop or an increased level of intrusion upon the individual

7

involved. *See, e.g.*, *State v. Ferrise*, 269 N.W.2d 888, 891 (Minn. 1978) (stating that when an officer opened a car's passenger door to speak with the passenger because he could not see inside, "[t]he test is the reasonableness of the intrusion under all the circumstances, and in this case the minimal intrusion was completely reasonable and proper"). We do not see any reason to conclude that the partial opening of a door should be treated differently than the complete opening of a door, especially here where the opening allowed Officer Y. to gain easier access to and greater visibility of parts of the car than he had previously. We conclude, consistent with the determination of the district court, that Officer Y. expanded the scope of the traffic stop when he opened the door the rest of the way after the driver exited the car and left the door only partially open.

### III

Having concluded that Officer Y. expanded the scope of the original traffic stop when he opened the driver's door fully, his action must be supported by reasonable, articulable suspicion that justified his doing so. *See Askerooth*, 681 N.W.2d. at 364-65. In this context, reasonableness is an objective standard that mandates an inquiry into whether "the facts available to the officer" at the time of the expansion "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 364 (quotation omitted). "The test for appropriateness, in turn, is based on a balancing of the government's need to search or seize and the individual's right to personal security free from arbitrary interference by law officers." *Id.* at 365 (quotation omitted). And "[f]inally, it is the state's burden to show that a seizure was sufficiently limited to satisfy these conditions." *Id.*

8

In considering this issue, we first address the state's argument that the district court clearly erred with respect to a factual finding relevant to the reasonable-suspicion analysis. Then, we assess whether reasonable suspicion was present to justify the stop.

**A**

The state does not dispute that Officer Y. fully opened the door after the driver exited and left it only partially open. But it takes issue with the district court's factual finding that the drug paraphernalia, i.e., the "smoking device," in the door's pocket "was in plain view to [Officer Y.] once the door was fully open." The state maintains that the evidence "reflect[s] that the smoking device was plainly visible to [Officer Y.] after the driver opened the door without the officer having to touch or further move the open door." The state therefore would have us include the paraphernalia as a fact known to the officers at the moment of the expansion of the stop.

Applying our clearly erroneous standard of review to this issue, "[f]indings of fact are clearly erroneous if, on the entire evidence, we are left with the definite and firm conviction that a mistake occurred." *State v. Andersen*, 784 N.W.2d 320, 334 (Minn. 2010). In other words, a finding is clearly erroneous if it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021) (quoting *Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 726 (Minn. 1985)). We "may independently review facts that are not in dispute." *Gauster*, 752 N.W.2d at 502.

To support its argument, the state references the following testimony from Officer Y.'s direct examination:

9

Q: After [the driver] exited the vehicle, so, when he exited the vehicle, did he open the door?
A: He did, yes. . . .

Q: . . . Did you have to open the door yourself when—to see this meth paraphernalia?
A: I did not.

Q: So, you had seen it after [the driver] exited the vehicle himself and him opening the door himself?
A: Correct.

The state also points to the police report, admitted at the omnibus hearing, in which Officer Y. noted: "Upon [the driver] exiting the vehicle I observed in plain view a smoking device commonly used for the consumption of illegal narcotics in the driver door pocket."

This evidence does not persuade us that the district court's finding, that the paraphernalia "was in plain view to [Officer Y.] once the door was fully open," is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole," *Kenney*, 963 N.W.2d at 221. The evidence establishes that Officer Y. did not open the door in the first instance and that he saw the paraphernalia at some point after the driver opened the door. It does not address whether he saw the paraphernalia before or after fully opening the door. Indeed, on cross-examination, Officer Y. affirmed that "the door was only open at around a 45[-degree] angle at the time the driver left." But he "d[id] not recall" whether he "immediately fully opened the door" after the driver left.

Video evidence supports the district court's finding. Footage from the squad-car camera shows Officer Y. approaching the driver's side door after the driver walked to the back of the car. Officer Y. opened the door fully, stepped into the space between the door and the car's interior, and shined a flashlight into the interior of the car. About 20 seconds

10

after he opened the door fully, he moved the flashlight to shine into the door's pocket. He then alerted Officer B. that he found paraphernalia.

It is the role of the district court to weigh the evidence and make credibility determinations. *See State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) ("We recognize that the trier of fact is in the best position to determine credibility and weigh the evidence."). Considering the record as a whole, we are not "left with the definite and firm conviction that a mistake occurred," *Andersen*, 784 N.W.2d at 334, when the district court found that the paraphernalia was in plain view "once the door was fully open." Accordingly, we will not include the presence of paraphernalia in the facts known to the officers at the time of the expansion of the stop.

**B**

With that factual dispute resolved, we turn to whether Officer Y.'s actions were supported by reasonable, articulable suspicion. This is a legal question that we review de novo. *State v. Smith*, 814 N.W.2d 346, 350 (Minn. 2012).

The district court determined that the officers had reasonable suspicion to expand the scope of the stop because the officers learned that the driver was driving without a license. The state does not defend the expansion on that ground. Instead, the state asks us to apply cases that have held that "an officer's decision to open a car door during a traffic stop was reasonable." The state maintains that, "[b]y analogy, because an officer opening a car door is a greater intrusion than further opening one that is already open, the officer in this case acted reasonably." As we will explain, we are not persuaded that the cases on which the state relies are analogous here. And, considering the totality of the

11

circumstances, the officers did not have reasonable, articulable suspicion to expand that stop.

To determine whether reasonable, articulable suspicion exists, we must consider "the totality of the circumstances." *State v. Garding*, 12 N.W.3d 697, 702 (Minn. 2024). In doing so, we "look[] first to each identified fact supporting reasonable suspicion independently and then consider[] whether those facts, even if independently weak, are sufficient in the aggregate." *Id.* at 703. Here, the relevant facts known to the officers at the time of the expansion were: (1) neither the driver nor Oo had a valid driver's license, (2) the driver had an outstanding arrest warrant from Wisconsin, and (3) Oo's demeanor was "fidgety and nervous." We begin by assessing each circumstance individually.

First, Officer Y. knew that neither the driver nor Oo had a valid driver's license and that the driver had been driving illegally. The district court relied on the driver's lack of a valid license alone in its conclusion that Officer Y. had reasonable suspicion to expand the stop. But the Minnesota Supreme Court has repeatedly concluded that, without more, minor traffic violations, including lack of a license, are insufficient to justify expansion of a stop. *See Askerooth*, 681 N.W.2d at 369 (stating that "there is no basis to believe that lack of identification, without more," made it reasonable to expand a traffic stop); *State v. Wiegand*, 645 N.W.2d 125, 128-29, 137 (Minn. 2002) (determining that an officer cannot expand the scope of a routine traffic stop by conducting a drug dog sniff without reasonable suspicion); *State v. Harris*, 121 N.W.2d 327, 333 (Minn. 1963) ("Police officers may not ordinarily make searches upon apprehending motorists for simple traffic violations or upon the slightest hint of illegality."). At the time of the expansion of the stop here, the officers

12

knew everything they needed to regarding the misdemeanor offense of driving without a license. There is no reason to believe there was evidence in the car relating to that offense that would justify expanding the traffic stop.[4] We therefore conclude that this circumstance on its own was not sufficient to support reasonable, articulable suspicion of further criminal activity that would support Officer Y. fully opening the car door.

Second, we consider that Officer Y. was aware of the driver's active Wisconsin arrest warrant. The existence of the warrant is clearly established in the record. The officers testified that they asked the driver to exit the car because he was the subject of a warrant from Wisconsin. The district court made minimal findings about the warrant, stating only that "[t]he officers ran an arrest warrant check on [the driver]." Officer B. testified that they were not planning to arrest the driver because of the warrant and were planning to issue a citation until Officer Y. found the paraphernalia. *See* Minn. R. Crim. P. 6.01, subd. 1(a) (establishing that, in the case of a misdemeanor violation, officers acting without a warrant "must issue a citation and release the defendant unless it reasonably appears" the person should be detained to prevent bodily injury, prevent further criminal conduct, or because they likely will not respond to a citation).

Our caselaw provides little insight into the effect that an active out-of-state warrant has on a reasonable suspicion analysis. We consider it appropriate to treat the existence of

---

[4] The state asks us to also consider that Oo lied to the officers about having a license. It is unclear how that circumstance provides a basis for reasonable suspicion of any other criminal activity, and the district court made no findings on this point. In any event, we would also note that there was a communication barrier, and the parties were relying on an interpreter over the phone to converse.

the warrant in the same manner that caselaw directs us to treat criminal history more broadly in a reasonable-suspicion or probable-cause analysis. That is, it may be considered as one factor within the analysis but does not on its own justify an expansion of the stop. *See State v. Heaton*, 812 N.W.2d 904, 910 (Minn. App. 2012) (considering appellant's criminal history and change in supervisory status as two factors among others in a reasonable suspicion analysis), *rev. denied* (July 17, 2012); *State v. Lugo*, 887 N.W.2d 476, 487 (Minn. 2016) ("Arrests not resulting in conviction may be considered when the arrest was for an offense of the same general nature."); *see also State v. Lieberg*, 553 N.W.2d 51, 56 (Minn. App. 1996) (concluding that "the trial court properly considered [Lieberg's criminal history] as one factor in the totality of relevant circumstances"); *cf. State v. Carter*, 697 N.W.2d 199, 205 (Minn. 2005) (cautioning that "a criminal record . . . is best used as corroborative information and not as the sole basis for probable cause" (quotations omitted)). The state does not argue that the warrant alone is sufficient to justify an expansion of the traffic stop. And we see no reason, considering the district court's findings and the officer's testimony, that the warrant's existence alone gave the officers reasonable, articulable suspicion to expand the scope of the stop.

Third, the record establishes that Officer Y. noticed Oo's "fidgety and nervous" demeanor. This court has concluded that, "While an officer's perception of an individual's nervousness may contribute to an officer's reasonable suspicion, nervousness is not sufficient by itself and must be coupled with other particularized and objective facts." *State v. Syhavong*, 661 N.W.2d 278, 282 (Minn. App. 2003); *see also Garding*, 12 N.W.3d at 705 ("In general, we have expressed reluctance to rely on evasive or nervous behavior as

evidence to support a reasonable, articulable suspicion of criminal activity."). As such, Oo's demeanor is a factor for this court to consider, but it is insufficient to justify the expansion here on its own.

Although each of those circumstances is insufficient on its own to establish reasonable, articulable suspicion of criminal activity, we must further assess whether they are sufficient when considered together. *See Garding*, 12 N.W.3d at 702-03. In our analysis, we balance those circumstances with the nature of the intrusion involved. *Askerooth*, 681 N.W.2d at 365 ("The test for appropriateness . . . is based on a balancing of the government's need to search or seize and the individual's right to personal security free from arbitrary interference by law officers." (quotation omitted)). We recognize that the extent of the intrusion or expansion here was only the partial opening of the already halfway open door. But we consider that intrusion in light of the district court's finding that the drug paraphernalia that led to the search of the car was visible to Officer Y. "once the door was fully open." In this context, even the small action of opening the door the rest of the way enhanced Officer Y.'s view of what otherwise are more private areas of the interior of a car. We are not convinced that the facts known to the officers justified that intrusion.

In arguing otherwise, the state directs us to *Ferrise* and three nonprecedential cases that held that an officer's act of opening a car door was reasonable, but the facts in those cases are materially distinguishable. *See Ferrise*, 269 N.W.2d at 891; *State v. Perkins*, No. C5-97-2013, 1998 WL 217212 (Minn. App. May 5, 1998); *State v. Downwind*, No. A17-1321, 2018 WL 2407204 (Minn. App. May 29, 2018), *rev. denied* (Minn. Aug. 21, 2018);

*State v. Atkins*, No. A19-0021, 2019 WL 6112359, (Minn. App. Nov. 18, 2019). For example, in *Ferrise*, the officer wished to speak with the individual sitting in the passenger seat but because the car was covered in snow and he could not see inside, he opened the door to do so. 269 N.W.2d at 889. In that case, the supreme court likened the officer's opening of the passenger door to the routine practice of ordering drivers out of their cars, stating that they both amounted to the same level of intrusion, and ultimately concluded that the officer's action in opening the door was lawful. *Id.* at 890-91. The supreme court explained that the justification for both actions was that "establishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault." *Id.* at 890 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)). Here, no further opening of the door was required to facilitate a "face-to-face confrontation" because the driver was already out of the car and speaking directly with Officer B. *Id.* at 890 (quotation omitted). As for Oo, he had gotten out of the car around the same time as the driver but was directed he could get back in, so it is evident the officers were not trying to engage in more face-to-face interaction with him. Those facts make this case unlike *Ferrise* and, more generally, unlike an order for someone to exit their vehicle.[5]

---

[5] The other cases the state cites are nonbinding, but even so we find them readily distinguishable. In *Atkins* and *Perkins*, as in *Ferrise*, the officers opened the car door when there was an individual sitting directly inside with whom the officer was trying to communicate, unlike the case here. *Atkins*, 2019 WL 6112359, at *1; *Perkins*, 1998 WL 217212, at *1. In contrast, in *Downwind* there was no one in the car, but the defendant had been arrested and, after arranging with the officer for the owner of the car to pick it up, the officer opened the car door to make sure it was locked before leaving it. *Downwind*, 2018

The circumstances known to the officer here were all weak indicators of criminal activity, with each requiring additional factors to support reasonable, articulable suspicion. Together, they do not point to an articulable justification for the officer's conduct in gaining a better view of areas of the interior of the car that typically are not visible to others. They provide, at most, a "hunch of criminal activity," which is not sufficient. *Timberlake*, 744 N.W.2d at 393 (quotation omitted). Even though the reasonable, articulable suspicion standard is "not high," the three circumstances combined fail to meet it. *Id.*

Officer Y., therefore, unlawfully expanded the traffic stop when he opened the driver-side door the rest of the way. Consequently, because the officers sought consent to search the car and searched Oo's satchel only after the drug paraphernalia in the car door's pocket was discovered, the evidence seized in those searches should have been suppressed as the fruit of the illegal intrusion. *Diede*, 795 N.W.2d at 842. We reverse and remand to the district court for further proceedings not inconsistent with this opinion.

**Reversed and remanded.**

---

WL 2407204, at *1. There are no such facts or justifications present here. So, the state's reliance on those cases is misplaced.